### ALLIS-CHALMERS CO. v. IRON MOLDERS' UNION NO. 125 et al.

(Circuit Court, E. D. Wisconsin. December 11, 1906.)

1. INJUNCTION — STRIKES — INTERFERENCE WITH EMPLOYER'S BUSINESS — CONCERTED ACTION BY STRIKERS—LABOR UNION.

Indirect interference by a labor union with the employer's business during a strike by preventing him from obtaining workmen by means which do not amount to coercion is not unlawful, so long as the purpose of the combination is merely to secure the legitimate advantage and economic advancement of the members, and not to injure the employer, although harm may incidentally result to him.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Injunction, §§ 172, 174, 175; vol. 10, Conspiracy, §§ 7–11, 55, 56; vol. 35, Monopolies, § 10; vol. 34, Master and Servant, § 1283; vol. 45, Torts, §§ 4, 13; vol. 46, Trade Unions, §§ 5, 6.]

2. SAME—VIOLATION OF INJUNCTION.

A labor organization, or its officers, or a committee which selects members to act as pickets during a strike, may become responsible for the unlawful acts of such pickets or their violation of an injunction, although they were instructed in good faith to observe the injunction, and do no unlawful act where with knowledge that the instructions have been disobeyed by particular persons they are still kept in the service.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Injunction, §§ 493, 485.]

3. CONSPIRACY—PURPOSE—LAWFUL ACT.

A conspiracy to do an act may be unlawful, although the act, if done by a single person, would be lawful.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Conspiracy, § 2.]

4. INJUNCTION—VIOLATION BY STRIKERS—PICKETING.

The action of pickets established by strikers may amount to coercion and intimidation of workmen of an employer, and a violation of an injunction against the use of such means although no act is done which would be unlawful if done by a single individual where the mere number of pickets acting together and their persistent following of the workmen to and from their work day after day for months is in itself a constant threat producing fear and alarm among the workmen.

5. SAME—INTIMIDATION OF WORKMEN.

A simple request to do or not to do a thing, made by one or more of a body of strikers under circumstances calculated to convey a threatening intimidation, with a design to hinder or obstruct workmen, is unlawful intimidation, in violation of an injunction against the use of such means, and not less obnoxious than the use of physical force for the same purpose.

6. SAME—INTERFERENCE WITH EMPLOYER'S BUSINESS BY STRIKERS—PICKETING.

The constant maintenance of pickets by strikers after repeated acts of violence, the use of abusive epithets, and the creation of an unfriendly atmosphere surrounding workmen by such pickets, constitutes a conspiracy

for the purpose of willfully or maliciously injuring the business of the employer, within the meaning of Rev. St. Wis. 1898, § 4466a, which makes such a conspiracy a criminal offense, and is a violation of an injunction against such conspiracy.

7. SAME—CONTEMPT PROCEEDINGS FOR VIOLATION—UNINCORPORATED TRADE UNION.

A trade union in Wisconsin, which is merely an assemblage of persons not given the right by statute to sue or be sued in its common name, cannot, as such, be fined for contempt for violation of an injunction, although it was made a party to the suit by name, and a general appearance was entered for it.

In Equity. On proceedings to punish for contempt.

Turner, Hunter, Pease & Turner (W. H. Timlin, of counsel), for complainant.

Rubin & Zabel, for defendants.

SANBORN, District Judge. The original bill was filed June 16, 1906, by complainant, a New Jersey corporation, for convenience called the company, for an injunction, against four unions of iron molders in Milwaukee and South Milwaukee, and some of their officers and members, to restrain them from obstructing complainant's business by coercion, intimidation, or violence, in a number of ways, as (1) procuring workmen to quit; (2) coercing apprentices to break their contracts of service; (3) preventing workmen from entering the company's service; (4) coercing the company to discharge or not employ workmen; (5) aiding any conspiracy or combination to obstruct the company's business; (6) assisting, aiding, or abetting any of such acts; (7) also restraining picketing, patrolling, or guarding the streets, gates, and approaches to the company's shops, to intimidate or coerce workmen or seekers for work, and congregating in the vicinity to intimidate or coerce workmen; (8) interfering with or molesting workmen or those seeking work; accompanying, following, talking to or going to the homes of workmen against their will, or going to their homes to intimidate them to quit work or enter employment, or intimidating or threatening their families; (9) restraining boycotting any person doing business with the company; (10) in any way menacing or obstructing the company in prosecuting its business.

The four iron molders' unions made defendants are voluntary associations of workmen, associated in the usual manner of trade unions, but doing no business in the ordinary way of buying, selling, trading, or dealing wtih property or money. These unions are made parties by name; all the members not being joined, nor one or more members joined as representing all the members. An answer was filed July 6, 1906, purporting to be on behalf of the four unions, and all the individual defendants. There is no statute of Wisconsin providing for bringing actions against such voluntary associations as these, except that section 2604 (Rev. St. 1898), provides that when the question is one of common or general interest to many persons, or when the parties are very numerous, one or more may sue or defend for the benefit of the whole. Union No. 125 contains about 1,000 members.

### Averments of the Bill.

The bill alleges in substance as follows:

The defendant unions are members of a national organization called "Iron Molders' Union of North America," and subject to its constitution and rules, and the membership of the unions is made up of molders and coremakers. The defendant unions have formed a conspiracy to destroy the company's business, unless it will assent to their terms. All the defendants are members of the unions, except O'Leary, who is an officer to said National Union, and he has been aiding and advising defendants in such conspiracy. There are a large number of manufacturers in and about Milwaukee who employ iron molders and coremakers. Defendant Schwab is the business agent of the unions, and has direction and command of their members, and has acted as their agent in their negotiations with the employers.

A conference committee of the unions, composed of defendants Schwab, Hanna, Harbricht, Katzbaun, Winkler, and Morz, was authorized by the unions, and other defendants, except O'Leary, to demand certain things of the employers, to be embodied in written contracts for a definite period; the demand was made, and the company increased wages to an amount exceeding the sums demanded, but refused the other demands. Thereupon, and on May 2, 1906, defendants struck, and left the company's service, and a general molders' and coremakers' strike occurred in other shops in Milwaukee county, which is still on.

The object of the strike was the control of the employment of molders' apprentices, handy men, superintendents and assistant superintendents in Milwaukee, West Allis, and South Milwaukee, and to prevent any such mechanics from working at their trade in said cities without first becoming members of the unions. Upon the strike being inaugurated, the company's striking employés and other union coremakers and molders gathered around the company's place of business, and put in force what is commonly known as the "system of picketing," and began a systematic course of intimidation of the company's workmen and other foundrymen in said cities, for the purpose of preventing nonunion workers from remaining in their employment; and such workmen were stopped and warned by the pickets and others not to return to work. That the picketing is still maintained, and the defendants and their associates and other pickets have assumed a menacing and threatening attitude toward the company's workmen going and coming from their work, have assaulted and beaten some of its workmen, and pursued such course of intimidation. That the company's workmen and other foundrymen have become frightened and intimidated, and refuse to continue work unless the company furnish them with special guards or take other precaution to protect them, and some of the company's workmen who are anxious to continue work have remained away because of their fear of the pickets, strikers, and their associates, resulting in irreparable injury to the company.

The company has requested the service of other workmen, and a large number have sought its employment, but were intercepted by said defendants and their pickets and associates, and induced and

coerced by threats and intimidation and unlawful persuasion not to enter such service. That defendants have entered into a conspiracy to inflict injury to the company's business, and coerce it into the execution of the agreement referred to; and, in furtherance of the conspiracy, have maintained the picketing system, causing the company's premises to be surrounded by some of the defendants and others combining with them, who have daily intercepted and approached the company's workmen and persons seeking its employment, and by threats of personal violence, assaults and batteries, intimidation, and unlawful persuasion have induced the workmen to leave their employment or refuse to take it. That the picketing system, in connection with physical violence so inflicted, has terrified the company's workmen and intimidated those seeking employment who would otherwise have entered its service, whereby the company has been deprived of the services of a large number of persons who would otherwise have entered its employment, and it has been unable to secure workmen, and greatly injured thereby. That defendants in maintaining the picketing system are acting together under the direction, instigation, and advice of O'Leary and Schwab and the officers and managers of the unions, for the common purpose of injuring the company's business and terrifying its workmen, and coercing it to execute said agreement; that defendants and others associated with them are surrounding its premises, are engaged in altercation with its employés, call them vile names such as "scab" and other opprobrious epithets, threatening their personal safety unless they cease work, and are intimidating, terrifying, and coercing them in numerous ways, especially by following them to their homes against their will; and that some of the workmen have quit work, and others are so intimidated that they are about to do so; that the company has had, and now has, in its employment a large number of apprentices learning the molders' trade, some of whom have a long time and others a short time to work. Some of them are quite skillful mechanics, and are under contracts in the company's service. Defendants combined and conspired to induce apprentices to break their contracts, and quit the company's service, and to that end have sought interviews with the apprentices, persuading them to leave their work, made promises of emolument to them if they would do so, and offered to affiliate them in some way as members of the unions. Such efforts to induce apprentices to quit are being continued, and complainant fears that they will be successful.

Boycotts of persons contracting with the company through the United States are alleged, and the company will be unable to complete its contracts with its customers if the interference and obstruction of its business by the defendants continue, resulting in great and irreparable loss and damage to the company. The company is necessarily obliged to employ skilled mechanics other than molders and coremakers, whose employment is dependent upon the foundry product; and, if such skilled mechanics are prevented from doing their work by defendants, the company's business will be crippled and seriously injured, to its great damage. By reason of such conspiracy,

the company has been prevented from carrying on its business in the ordinary way, and it is being injured by the acts of defendants. Other allegations amplifying the foregoing are contained in the bill. It charges, in addition to damages which cannot be estimated, $10,000 actual damages.

A temporary restraining order was granted upon the bill and accompanying affidavits. The defendants answered, substantially denying all the allegations of the bill relating to conspiracy, intimidation, and coercion. Upon the hearing for a preliminary injunction, it was denied on the ground that the equity of the bill was substantially denied by the defendants.

### Supplemental Bill and Proceedings Thereon.

On September 11, 1906, complainants filed their supplemental bill, which, after alleging the general object and purpose of the original bill, avers acts of the defendants subsequent thereto substantially as follows:

Defendants have continued, kept up, and attempted to carry out the unlawful conspiracy set forth in the original bill, and have committed many acts of intimidation and violence at various dates from June 25 to September 6, 1906, in all, 17 in number. These particular instances of unlawful conduct cover personal abuse and violence, intimidation, assaults, threats of personal violence and otherwise, coercion, etc. It is alleged: That there were many other like assaults and batteries, threats of personal violence and abuse of workmen, and that the pickets are still continued, and that all of said defendants have aided, countenanced, and advised such unlawful acts, which were committed with their active co-operation, countenance, and consent, and often in their presence, in aid of the common design or conspiracy. That workmen were beset, surrounded by pickets, threatened, intimidated, coerced, assaulted, and beaten. Defendants, by threats and persuasion, have induced the apprentices to break their contracts and leave the company's employment. In regard to boycotts, it is alleged that the company had contracts with persons and corporations in Chicago and Buffalo, and that such corporations were notified by the Iron Molders' Union of North America to stop working on the company's work. Such boycott is still being carried on and in force.

An injunction is prayed for as in the original bill. The supplemental bill was supported by a large number of affidavits.

On September 21, 1906, the defendants answered the supplemental bill, denying generally all of its allegations, and alleging that it was the purpose of the company to coerce the defendants to return to work, and that it has given out that it would not employ any of the defendants so long as they were members of the union. They also deny conspiracy, confederacy, or unlawful acts of any kind, or that they have employed violence, threats, or intimidation upon workmen or apprentices, and deny all the acts of violence alleged in the supplemental bill. They allege that the records of the police and criminal courts of Milwaukee will show that the conduct of the molders on strike has been proportionally better than that of the rest of the community, while the records of the men employed to take their place have

been proportionally worse. In regard to the boycotts alleged in the supplemental bill, they deny that the company has been boycotted, and that there is any conspiracy to boycott any of its contractors, and that defendants have no knowledge of any such action taken by union molders in other cities. The only way that other unions know of the strike in Milwaukee is through appeals for financial support, and that defendants and their associates and the unions have not asked a single person outside of Milwaukee to aid them in their strike, except financially, or to refuse to work upon any of the company's contracts wherever found.

Defendant O'Leary, as to the alleged boycotts, answers: That complainant has been sending its work to various foundries, and complaints have been made by union men in such shops, who refuse to work thereon, but they were in each instance advised to continue work upon the same, but in spite of such orders in many instances refused to work, and threatened to strike. That in all instances where men in other cities have refused to work on the company's contracts, it has been done solely by reason of the moral interest manifested in defendants, and by reason of their belief, as by them expressed, that by doing such work they defeated the purposes of the strike, and that the giving of financial aid when they were doing work that properly belonged to the defendants was in violation of the principles of the molders' constitution, and their ideas of American manhood. That complainant has made it a practice to offer work to shops where they knew union men were employed, and where their work was refused, for the sole purpose of causing a strike, so that the number of men receiving benefits would be so great that the strike would thereby be lost by reason of the inability of the organization to pay the benefits.

The defendants submitted a large number of affidavits in a general way, denying the allegations of the supplemental bill. In regard to the alleged boycott, the affidavit of James Brown, submitted on the part of defendants on September 21, 1906, states that in no instance was work coming from the company's shops refused because of any threats, coercion, or intimidation on his part or of any of the Chicago union men; that the company has two foundries in Chicago, and that the union molders in such shops are on a strike, and there are other shops in Chicago also on a strike; that there have been no communications between the Milwaukee and Chicago unions except in respect to financial aid; that there is no combination or conspiracy to refuse to do work upon Allis-Chalmers patterns or contracts; that it is true that union men in Chicago have refused to work upon patterns coming from the company's shops and also coming from other struck shops; but that said refusal was not caused by reason of the Milwaukee strike, but because of the Chicago strike. Until recently, deponent says, he has advised the men to continue upon such work, and they worked under protest until about the middle of August, when they resolved that they would not work upon any struck work; that it was deponent's duty to inform the shops of the position that the men took; and that in some cases the employers discontinued doing such work. Deponent did nothing more than call the attention of the workmen to the fact

that they were doing struck work, and the workmen refused to further work upon the same, whereupon the employers discontinued the work of their own will.

On the motion for a temporary injunction founded upon the supplemental bill and affidavits, the court delivered an opinion at considerable length, stating that the first injunction had been denied, because the defendants had put in issue all the averments of the bill and presented a large number of affidavits which traversed the essential features of the company's case. After stating the right of the defendants to strike, their right to combine and work together for better conditions, and that the company had a corresponding liberty as to whom it would employ, how its work should be done and its business be conducted, the right and liberty of the nonunion men, the court, in its eighth and ninth propositions, stated the law as follows:

"Eighth. Defendants have the right to discuss or argue in a peaceable way with new employés whether they should work for the complainant. They may persuade them, if they can, but have no right to use force, threats or violence, nor to strengthen their appeal by a show of numbers. Persuasion by force of numbers amounts to intimidation. The new employés, or those seeking employment, have the absolute right to go and come as they please without fear or molestation and without being compelled to discuss or argue, unless they are pleased so to do. No man is to be insulted or harrassed because he chooses to work. No man is so humble as to be beneath the consideration of the court, and no combination of men so strong as to be above the law.

"Ninth. The defendants have no right by threats of strike or other hostile methods, to interfere with the business relations subsisting between the complainant and any other foundry or establishment. Such a boycott to cripple the business of the company would be indefensible and odious in the sight of the law."

## An injunction was granted restraining the defendants, as follows:

"(1) From in any manner interfering with, hindering, obstructing, or stopping the business of the said company complainant, or its agents, servants, or employés, in the maintenance, conduct, management, or operation of its business.

"(2) From compelling or inducing, or attempting to compel or induce by threats, intimidation, force, or violence, any of the said company's employés to fail or refuse to work for it, or to leave its service;

"(3) From preventing, or attempting to prevent any person or persons by threats, intimidation, force, or violence, from freely entering into or continuing in the said company's service.

"(4) From doing any acts whatever in furtherance of any conspiracy or combination to interfere with or obstruct the business of the said company, its officers, agents, or employés.

"(5) From congregating upon or about the company's premises or the streets, approaches, and places adjacent or leading to said premises, for the purpose of intimidating its employés, or preventing or hindering them from fulfilling their duties as such employés, or for the purpose, or in such manner as to induce or coerce by threats, violence, intimidation, or persuasion, any of the said company's employés to leave its service, or refuse to enter its service.

"(6) From maintaining at or near the premises of said company any picket or pickets in a threatening or intimidating manner.

"(7) From interfering with the said company's employés in going to and from their work.

"(8) From going singly or collectively to the homes of said company's employés for the purpose of intimidating or threatening them or collectively persuading them to leave its service.

"(9) From enforcing, maintaining, or aiding any illegal boycott against the said company, its agents or employés.

"(10) From endeavoring to illegally induce people not to deal with the said company, its agents and employés; which commands and injunctions you are respectively required to observe and obey."

In regard to picketing, the court, in its opinion granting the injunction, stated that too many men had been employed for that purpose. The striking workmen have a right to discuss in a friendly way, or argue with the workmen who are employed by the company, but when five men argue with one, that is a show of power as distinguished from persuasion; the sense of power takes hold of the five men while the other is oppressed by fear. If peaceable picketing is to be continued, as the complainant recognizes it may be, in the form of the injunction presented, the court suggested that the two men who represent the union, and who stand at the gate for the peaceful and honorable purpose of discussion, be recognized by some badge. This suggestion was adopted by the defendants, and a badge in the form of a ribbon was at first adopted, and then some 200 white buttons were ordered and were worn by the pickets. After some discussion in regard to picketing and badges, the court said that he had no idea of putting such suggestions in the order; it was a mere extrajudicial suggestion for what it might be worth. The badge confers no authority whatever; it is a mere adjunct for the purpose of identifying the men who have been placed there by the unions, so that everybody might know who they are. The injunction reaches the men absolutely, and it reaches the man with a badge on if he does not comply with the terms of the injunction. A badge is no assurance to cover any violence or intimidation on his part. It is only so that if anything transpires, the man who is assaulted by a man with a badge on can identify him as a picket. That was a mere extrajudicial suggestion; it has no bearing. It may be entirely ignored by the parties. They are under no obligation to act upon it. The suggestion is predicated upon the theory that the injunction recognizes personal picketing; if it did not, it would be utterly idle.

### Proceedings on Application to Punish for Contempt.

On October 23, 1906, complainant filed its petition, citing the defendant unions and certain of the individual defendants and others, alleged to have aided and assisted them, to show cause why they should not be punished for contempt in violating the injunction of September 24th. The petition alleges that the persons cited have violated the injunction by interfering with, hindering, obstructing, and stopping the company's business, and have prevented by threats, intimidation, force and violence persons from freely entering its service; have congregated upon and about the company's premises for the purpose of intimidating its employés, and have coerced workmen and those seeking work, by threats, violence, intimidation, and persuasion from remaining in or entering its service, have interfered with its employés going to and from their work, and by doing various other acts covered by the injunction by way of combination, conspiracy, boycotting, obstruction, coercion, intimidation, and violence.

The petition sets out parts of the testimony given by various of the defendants in other proceedings in the state court. The defendant Henry Harbicht, at one time president of Union No. 125, testified substantially as follows: The union appointed a strike committee to conduct the strike, consisting of members of the unions, also a labor committee to find employment for the strikers, a committee on the foremen in the foundries, consisting of William Schwab. That it was the purpose of the committee on foremen to see the foreman in the shop who had taken out an honorary card, and was acting as foreman, and to notify him that he was still subject to the constitution, and to remind him of the provisions of the constitution, requiring the foreman staying at work not to instruct strike breakers, and that if they did teach others how to do the work of the strikers they would be undermining their brother members. That it was the purpose of the strikers to show the men who came to take their places that the strike was on and the purpose of it, so that they would not take the place of the strikers, and to show the laboring men that the instructions of the pickets were to speak to any man who would try to take the place of the strikers, and to persuade them not to do so. That if a common laborer should come into the shop to work, it was the business of the strikers to try to induce that man not to work. That this was his personal view, and he supposed others. "The strikers simply try to get the man into the organization, and if that prevents the employer from running his shop, it is immaterial to me whether he closes up or not. The object of trying to get the foremen and other workmen away and to prevent common laborers from doing the work is to prevent them from being skinned by capital. The reason of preventing common laborers from taking the place of the molders was that they would be breaking the strike, and were doing wrong by doing so. Common laborers have never been instructed to go out. I personally believed in it as well as others. If we can get the men doing work to understand that they are doing injustice to the men that have asked for better conditions, it is immaterial to me, individually, whether the foundrymen grant the demands or whether they go out of business. If we can prevent the employers from getting other labor to take our places, they will either go out of business or grant our demands. I believe that is what we are trying to do." He further testified that he knew it was illegal to solicit apprentices to break their contracts. That a number of apprentices were out from West Allis and joined the union. The rules of the union do not allow them to take any apprentices unless they have served four years.

William Schwab, another defendant, testified before a commissioner in the state court that the strike has been conducted under the direction of the unions by joint agreement among them. There have been a number of prosecutions, breaches of the peace, and assaults and batteries since the commencement of the strike, and the money that was used to pay the fines may have been drawn from the funds of the union; that is, taken care of by the strike committee consisting of John Lutz, Michael Katzbaun, Ed Scaife, George Lennon, and William Kœnig, who had authority to draw the money and pay the fines,

at their discretion; collections being taken up among the men for that purpose. The union furnished counsel to defend men charged with crime in connection with the strike. Pickets are selected and directed by strikers who were formerly in the shop which is picketed. They have a marshal who has charge of placing the pickets. The men are designated by having their names put on a blackboard at headquarters. Witness had charge of reasoning with the assistant foremen in the shops. The apprentices came up voluntarily before the strike committee, and, after that meeting, a number of apprentices from the company's shops quit. The arguments witness used with the assistant foremen who were holding honorary cards were that they were amenable to the laws of the organization, and referred them to those laws. He told them that they had no right to work with a card in their pockets. The interviews did not result in taking the men out or surrendering their cards. The men said they thought they were doing nothing wrong; that they could be of more use to the union inside than outside the shop. Witness did not know what they meant by that. Union cards were issued to apprentices on strike, and a number of them were initiated. They had no record that these men had worked at their apprenticeship four years. The union has the right to initiate, whether they have been apprentices four years or not; but that is not stated in the constitution. Witness had been informed that their contract of apprenticeship was not legal, and it was up to the apprentices to break their contract or not. He knew he had no right to advise them to break their contract; thought it was proper for members of the union to instruct apprentices under what conditions they might be working in the future. As to whether it was to encourage them to break their contract, they must take it as they saw fit. The reason why they wanted the apprentices out of the struck shops was that they would probably be aiding the firm in making conditions which in the future they would have to work under; in other words they would be aiding the firm in breaking the strike by doing the work and urging others to do the work. As to whether the unions or the striking molders sanctioned the breaking of the contract by the apprentices, that was up to the apprentices. The boys are receiving a benefit every week which is upholding them, so far as getting a part of their living is concerned. About 50 apprentices have been received into the union since the strike.

John Lutz, another of the defendants, testified in the state court that he was a member, a trustee, and vice president of Union No. 125, a member of the conference committee, treasurer of strike benefits, and on the strike committee; looked after the business around the courts. "The business of the strike committee was to see that the strike was properly conducted, that the men should keep the peace, see to the pay rolls, that the money is paid out right, and everything kept in order. I think it is right, as far as my judgment goes, for men to strike to compel the employer to stop running his shop on piecework, and do everything in their power by peaceful persuasion by argument with people, who want to work, and are working, to prevent the employer from running the shop unless he will run it

without piecework.  I believe, as a union man, that the union men have a right to induce handy men not to work.  I do not believe they have the right to induce the common laborers not to work.  We have nothing to do with them.  The strike is for shorter hours and better conditions and increased wages; and, also, to secure a contract so that things would run smooth and there would be no trouble."  As to the apprentices, he testified that they came up to the hall, and he and Mr. O'Leary spoke to them.  He stated to them the conditions under which he had worked years ago, and when he got out of his time he got $2 a day.  After they organized, the amount was advanced from $1 to a $1.50 more a day, which are the conditions they have to-day, and the conditions they want.  "This was done to show them what prosperity we had since we have been organized, and that we could not get this kind of wages without organization.  I wanted the apprentices to know what I had to work for when I got out of my time, and what they would work for when they got out of their time, if we were in existence."  O'Leary talked to the boys, asked them what they wanted, and lots of them jumped up and said they wanted to be with him; "when are you going to take us out," and such remarks.  Forty apprentices were there, and from every shop in the city.  Witness did not know how they got there together.  The boys stated to Mr. O'Leary and himself to let them know when they wanted them.  Most of them came out.  They have been all receiving strike benefits, $5 a week—money contributed for that purpose by the unions, different locals throughout the country.

The petition states that another witness, not a party to this suit, testified that the underlying idea of the strike was that if the strikers could keep people from doing the strikers' work, the business would have to stop, and the employers would have to accede to the strikers' demands.  That has been the struggle right along.  If the foundrymen can get machines or men to take our places, the strike will be lost.  "I considered it lawful to interfere with the employer's business in this way."  This testimony is referred to, because it states in a concise way the position of the strikers, as shown by the testimony taken in these proceedings.

The petition further shows that the picketing or patrolling had been kept up since the injunction, for the purpose of threatening and intimidating workmen and those seeking work; the method of maintaining the system being more particularly shown by the affidavits accompanying the petition.  It is further stated in the petition that various acts of violence committed by pickets, and those associated with them, and in some cases by persons unknown, occurred at various dates after the making of the injunction, as follows:  September 29th, Matthias Bednar was threatened and beset by a striker.  October 3d Frank Buck was threatened by three strikers; one of whom told him if he did not stop work that they would split his head open.  October 16th John Burns, a special guard in the employ of the company, was threatened by two molders, one of whom said:  "Never mind, we will get you yet."  At the same time there were five other striking molders on the opposite side of the street—one of them named Kramer,

and another Paulsen. October 16th Steve Chrobat was beset and surrounded by five pickets, each wearing the button, and ordered to quit work or he would get his "block knocked off"; by reason of which Chrobat quit work. October 12th John Ciepluch was followed to his home by four pickets, one of whom struck him, and all of them swore at, abused, and threatened him with bodily injury, to kill him and shoot him, and chased him from the car to his gate. The next morning he was threatened by five pickets with death and great bodily harm if he did not leave the employ of the company. October 12th three workmen of the company were stopped by seven or eight pickets and told to stop working, and if they did not they would have their "blocks knocked off," and said employés quit work, fearing personal violence. October 11th, 1906, threats were made to John W. Paroffski by four pickets with badges, and one of them struck him on the nose and knocked him down, and all of them assaulted and kicked him violently about the body. October 8th Adam Nowak was stopped by three unknown men and informed there was a strike on, and one of them struck him a severe blow on the head. October 20th two apprentices were stopped by two pickets wearing buttons, and told that they must stop work. If they did not, the pickets would meet them again and show them what they had coming. October 20th Andrew Hordick, a molder in the company's employ, was going home accompanied by a guard, when two men who had been pickets approached within about 50 feet, and called him and the guard "scabs" and other vile and obscene names. One of them threw two stones at the guard, and one of the pickets said: "We will kill old man Hordick, and we will get you too." At the same time three confederates of the pickets were near by and joined in the abuse and threats.

The petition further states that many precautions have been taken to protect the company's workmen, and that many of the workmen will not remain in its employment unless special guards are furnished to accompany them to and from their work. Others have quit work through intimidation and fear of their lives. The petition sets out at length the attack on workmen at the Vilter Manufacturing Company's plant in Milwaukee by John Feeley, deceased, who was made a party to this suit, and made an affidavit for the defendants. October 17th Feeley and other union molders and strikers attacked three employés of the Vilter Company, as they were leaving the works at night. Feeley fired at one of the workmen with a revolver, and the bullet went through his shoulder, and Feeley then fired at one of the guards named Johnston, and was immediately shot by another guard and killed, and the coroner's inquest found that the firing by the guard was justifiable homicide.

The petition further states the writing of the letter by the executive committee of Union No. 125 to James Aston, formerly a member of the union, and working for the company, stating that charges were preferred against him for continuous scabbing, and asking him to appear before a committee for trial. The petition further sets out at considerable length that the system of picketing is one of intimidation, oppression, coercion, threats, violence, and force, and that the unions and all the

defendants have violated the injunction, and mentions 20 specific instances of such alleged unlawful acts, as shown in the supporting affidavits, all to the great damage and injury of the company, and that such acts were pursuant to the unlawful conspiracy and combination stated in the bill. A rule to show cause was issued why certain of the defendants and others not parties who were aiding, assisting, and confederating with defendants should not be adjudged guilty of contempt of the injunction. At the hearing 91 witnesses were sworn. Much of the testimony related to specific acts of intimidation and violence alleged to have been committed by pickets and others, and considerable testimony was given tending to rebut the evidence of such unlawful acts.

The picket system: At the time of the strike a number of the strikers volunteered to do picket duty. All the men on strike were required to call at headquarters once a day and register their names, and all men not at work were expected to do picket duty in turn. If they do not register they get no strike benefits. The strikers received $7 per week strike benefits, which was paid by the International Union. Nothing additional was paid them for picketing. The pickets at each shop were in charge of a marshal and a captain. The captain posted on a blackboard at headquarters each day the names of those who were to do picket duty the following day. Austin Slattery or James Boyle was captain of pickets at the Reliance shops, Daniel Lonergan at the South Foundry, and George Anderson, Sr., at West Allis. The marshals meet each day, and have a chairman and secretary. One of the strikers was detailed to watch the office of the Foundrymen's Association, which is an association of the employers. The office is on Mason street in the business part of the city. He is placed there to interview persons seeking work as molders, explain to them that there was a strike on; that they were taking the bread away from the strikers, etc. He did not inform any one, or report as to any men going to get work, but told the workmen they ought not to take the strikers' places, and tried to persuade them not to do so, but did not follow them up. Generally they would promise not to go to work. He did not stop men against their will; if they would not stop to talk with him he would not speak to them. After the injunction the pickets were instructed by their officers not to lay hands on any one, or threaten them or interfere with them, and if they could not talk with them in a peaceable way to leave them. Instructions were given also before the injunction, but not so strict. No change was made in the plan of picketing after the injunction only as to the behavior of the pickets; and the number of the pickets was somewhat less, partly by reason of the men getting other work. Mr. Lutz, treasurer of the strike committee, gave instructions to the pickets to behave themselves. The badges and buttons were furnished by the association.

The strike committee: Michael Katzbaun is chairman. They give their whole time to the business of the strike, meeting every day. It has charge of the strike against all the shops. It receives the money from headquarters to pay benefits, and also the local assessments to help the strike, and takes orders for coal. Takes care of the moneys.

The local assessment is 25 cents a day for all who work, in addition to what is paid by the National Association. The committee hires and pays an attorney to defend the strikers in prosecutions against them. John Lutz is treasurer of the committee, and looks after the legal proceedings. The strike committee is the highest local authority as to the strike. John Lutz has paid out of the local treasury fines and costs of pickets and strikers who were convicted in the Milwaukee police court, with an agreement that the men could repay the money. Some men have paid their own fines. No fines are paid unless Mr. Lutz considers them to be in the right, and if he pays them, and thinks they are not in the right, he insists on repayment. In the case of William Henning, his bail was deposited from association funds. There is an attorney hired for any case coming before the courts.

Picketing at South Foundry: There were from 5 or 6 to 8, 9 or 10 pickets around the works at the South Foundry, and some days as high as 15. They were generally in pairs. Guards are provided to attend the workmen to and from the street cars, 7 in number. The number of workmen so attended is 75 to 85. At the same time the pickets would be strung along the streets, from 2 to 6 or 7 together, and they walk along with the men and guards on the opposite side of the street. The pickets did not talk with the men or attempt to do so, but would say "Scabs!" and use similar language. Some of the witnesses put the number of pickets with buttons who get together in one place at the same time as high as 14. Others say 5, or 6, and sometimes 8. Pickets to the number of 2 would approach workmen, and demand that they quit work, that they were "doing" the wives and children out of bread and butter, and if they didn't quit they would know the reason why; that they had no right to work there. There are a few particular instances of threats and violence on workmen at or near their homes by pickets and others who could not be identified. Many strikers not wearing picket buttons congregate near the saloons at the South Foundry. When the workmen come out they stand and look on; sometimes there are pickets with them. One witness says he has not been called a "scab" but twice since the injunction issued. The police force about the South Foundry has been increased since the strike from 1 to 3. The policemen go with the workmen to the street car. One of the policemen testifies that he had not seen the pickets talk to workmen, or do anything wrong, but they would stand across the street, some of them, and some would follow them to the car. A private street car has been provided for the workmen for about two months. There was a boarding house for the workmen inside the plant; but all the workmen left it in September, and have been going home since that time.

On October 24th the defendants William Henning, and Jagodinski, and a man not otherwise identified, except that he has red hair, two workmen in charge of guards, left the South Foundry for their homes. Henning and his two companions and four others were at a saloon near by. They ran out and Henning, Jagodinski, and the red-headed man came over to the workmen, calling out, "Can you speak to us?" The men walked on without replying, and Henning shoved or

crowded them off the walk. At the same time the other four persons walked along in the same direction on the opposite side of the street. Henning and the red-haired man called the workmen offensive names, and followed them several blocks to a police station, where all went in, and one of the men said he wanted protection. Henning insisted that the workmen should be searched for concealed weapons. The police lieutenant searched all of the men, but found no weapons. Henning then walked back to the works with the guard. When the other workmen quit about 5 o'clock, numbering about ———, they were attended to the street car by several guards. Henning, Jagodinski, and another picket named Frawley followed the men, and Henning said, "How do you do boys," and "Let us join the ranks." They interfered with the passing of the workmen to some extent, and then Henning insisted on searching one of the guards for a concealed weapon, and took hold of his clothing. At this point two policemen, fearing there would be a fight, came up, and one of them took hold of Henning, and told him not to bother the workmen; but he insisted on searching the man. The policemen shoved Henning off the walk, and he again insisted on the search, got into words with the policeman, and was arrested by him, taken to the police station, and afterwards tried in the police court. Jagodinski followed Henning and the workmen, but did not interfere with the latter in any way; but after the arrest he took the picket button off from Henning's coat. The three men wore buttons.

Another instance of intimidation at the South Foundry was the case of Stephen Chrobat, October 16th, when John Schmitt and two other men interfered with Chrobat when going home. Schmitt threatened him that if he did not quit work he would "knock his block off," and the others told him he had better "get out of there" or he would get hurt. Schmitt wore a picket button. Chrobat testified that he had seen pickets together at the South Foundry to the number of 7 or 8 in a bunch four or five times in the space of two months. Joseph Ciepluch was also stopped and threatened by pickets, and called "jack" and "scab," with plenty of profanity, while going to the car from his work at the South Foundry, and afterwards assaulted by them at his house. This was October 12th. When he took the car, one of the pickets said, "Come quick, we will meet him down to his house." In going home the car went in a round about way, and when he got home attended by a guard, the union men were there. One of them, Gutkowski by name, but generally known among the workmen as "Levandrowski," took hold of Ciepluch, and one of the others struck him on the neck, but he got away and went into the house. The union men called the guard "scab" and other epithets. Gutkowski has continued to work as a picket since this assault. One of the union men was Joseph Vika, and another Jurowski, also called "Fitzsimmons" and "Blackie," because he is a prize fighter. When Ciepluch was stopped near the foundry there were five other pickets looking on from the other side of the street. The next morning when Ciepluch was going to work, he met Jurowski while transferring cars, who threatened to kill him and shoot him. At the point of transfer there are a number of pickets every

day who threaten him, telling him if he gets off and they get hold of him they will burn him right there. As many as 10 pickets are seen together at the South Foundry. Ciepluch was convicted once for carrying concealed weapons. His testimony as to the affair of October 12th was corroborated by that of the guard, Charles Buschman.

Picketing at Reliance Foundry, Clinton Street: On October 8th Adam Nowak, a workman, with another workman, was stopped by three men not wearing badges or buttons, and threatened and assaulted by them. These men could not be identified. John Holzbach testified that pickets have since the injunction followed him to the car nearly every night, and surrounded him until the car comes. "Then they jump right on—just for a scare most likely." A picket by the name of William Weimar called him vile names, not scab, but another word. Sometimes when the workmen come out the pickets come up close, within two feet, and follow them to the car. While waiting for the car they circle around, and make believe as if they wanted to get on, sometimes jump on and ride half a block and get off. This has happened twice. The other times they stand around until the workmen get on, "then they give us the laugh." There are from three to eight of the of the pickets. They don't say anything. Another witness testifies that a picket by the name of Thomas advised him in a friendly way to quit work, and said: "We will let you fellows work, but Holzbach, we are going to get him anyhow." He talked very gently. He informed Holzbach of this. He asked witness in a nice way to quit, talked very gently.

Picketing at West Allis: On October 3d Frank Buck, a workman at West Allis shops, was waiting for a car for home, when two pickets, William Nielen and John or Albert Kubatski (one of the witnesses in this proceeding), and two other men "held him up," as he expresses it. Nielen asked him if he was a workman, and knew there was a strike, and why he didn't go out. This was said in a quiet way. Nielen told Kubatski what Buck said, and Kubatski told him he had better quit work. One of the others shook his fist, and told him he had better quit before he had his head tied up, "before you bind your head together." Kubatski also told him in a quiet and friendly way, that he would meet him tomorrow night. The two other men were not identified as pickets or molders. On November 1st John Durovy, a workman, was abused and knocked down by two men, who took his overcoat. One of the men had been picketing, and wore a union button. His name was William Kirby. He was arrested under another name, Sebree. Kirby had been making a speech. Another witness says that both men had been pickets. On October 16th two pickets, Hasse and Andrew Paulsen, requested to speak to four men about to enter the employ of the company, and Hasse said, "We will fix you yet." Paulsen said, "Don't say that." Paulsen testified that he understood Hasse did not intend to make a threat, but to intimate that they would communicate with them later on. There were five other persons on the opposite side of the street near by, two of them pickets. A man wearing a picket button told an apprentice: "You have a good licking coming if you don't quit." This was in October. The man was drunk. Saw him sober afterwards, when he said nothing.

The right to strike for any cause or no cause is clear and fully sustained by all authority. Even a conspiracy to strike, followed by legal damage, is not unlawful if formed to better labor conditions. The right of workmen to combine in trades-unions, in order to secure the economic advancement of their members is also unquestioned; and such unions are generally regarded as beneficial institutions for bettering the conditions of labor, and the relations between employer and employed. Wabash R. Co. v. Hannahan (C. C.) 121 Fed. 563. Whether a threat to strike, or bring about a strike, when made by a number of persons acting in concert, is lawful, is an entirely different question. The right to strike being clear, the first question which comes up is, how far may the union and its members go to make the strike effective by preventing the employer from engaging other workmen, so that he will eventually be compelled to yield to the demands of the strikers? This is usually the pinch of the situation. Here is the point where two equally clear and valuable constitutional rights come into opposition— the right of the workman to get as much as possible for himself on the best terms, and the right of the employer to use his capital and ability as he pleases to secure whatever profit his investment and skill may bring. The legal right involved is single, but asserted by two independent and conflicting interests, and the question is, which one must yield his right to that of the other, so far as they conflict.

The general answer to this question is that neither must be permitted to maliciously injure the other without just cause or excuse. A more special answer is that so long as each, in the conflict between them, pursues only his own fair interest or advantage, and not the injury of the other, he is not liable for any injury which is merely incidental. As said by the Supreme Court of Wisconsin in the newspaper advertising case (State v. Huegin, 110 Wis. 189, 85 N. W. 1046, 62 L. R. A. 700), stating their conclusion negatively, a combination of persons to do acts to promote their own legitimate interests is not liable for injury which is only the incidental result of such acts, and such a combination is not a conspiracy to inflict malicious injury, within section 4466a, Rev. St. 1898. In other words, indirect interference by a labor union with the employer's business, not amounting to coercion, by preventing him from getting workmen to carry on his shop, is not unlawful so long as the combination is merely taking measures to secure its own legitimate advantage or economic advancement, although harm may incidentally result to the employer. So long as the betterment of labor conditions is the main object sought, even though the strikers may succeed in persuading all the available laborers to join their union, and support the strike, and, having thus secured a monopoly of the labor market, compel the employer, after long struggle and great loss of profit, to yield to the demands or go out of business, yet such injuries cannot be regarded as malicious, or such acts as criminal or unlawful, either at the common law or under section 4466a of the Wisconsin Revised Statutes of 1898. This conclusion is well expressed by Judge Adams in Wabash R. Co. v. Hannahan (C. C.) 121 Fed. 563. It is upon this principle that the act permitting picketing in England was passed, and many cases permitting "peaceful picketing" have been de-

cided, as well as other cases holding serious injury caused by sharp competition in business not to be actionable. While "peaceful picketing" is very much of an illusion, yet it is at least theoretically possible, and entirely lawful. It is expressly permitted by act of Parliament (St. 38 & 39 Vict. c. 86, § 7); Lyons v. Wilkins (1896) 1 Ch. 811; (1899) 1 Ch. 255.

The recent case of Karges Furniture Co. v. Amalgamated Woodworkers Local Union, 165 Ind. 421, 75 N. E. 877, 2 L. R. A. (N. S.) 788, discusses the question of lawful and unlawful combination, and holds that a strike by concerted action, followed by an agreement that the strikers would take peaceable means to induce other employés to join the union and strike, it being expressly resolved that under no circumstances should any striker endeavor by violence or intimidation to influence any workman, did not constitute a conspiracy. Peaceful persuasion of men to prevent them from taking the places of strikers, and paying their return railroad fare, held not unlawful. Johnston Harvester Co. v. Meinhardt, 60 How. Prac. (N. Y.) 168; Rogers v. Evarts (Sup.) 17 N. Y. Supp. 264. But see Reynolds v. Everett, 144 N. Y. 189, 39 N. E. 72; Sinsheimer v. United Garment Workers, 77 Hun, 215, 28 N. Y. Supp. 321; Standard Tube & Forkside Works v. International Union, 9 Ohio Dec. 692; Kerbs v. Rosenstein (Sup.) 67 N. Y. Supp. 385; Foster v. Retail Clerks, etc., Ass'n (Sup.) 78 N. Y. Supp. 860; W. & A. Fletcher Co. v. International Ass'n (N. J. Ch.) 55 Atl. 1077. Members of labor unions may, for the purpose of strengthening their organization, persuade and induce others in the same occupation to join their union, and, as a means to that end, refuse to allow their members to work in places where nonunion workmen are employed. There would be nothing wrongful or unlawful in their going upon the premises of the owner, with his permission, where their associates were engaged at work, for the purpose of ordering them or notifying them to desist from work thereon, unless their conduct in that respect be so persistent and annoying as to constitute a nuisance. Gray v. Building Trades' Council, 91 Minn. 171, 97 N. W. 663, 63 L. R. A. 753, 103 Am. St. Rep. 477.

Whatever may be thought of the soundness of these views there can be no doubt that the injunction in this case permitted all such picketing as should not be done in a threatening or intimidating manner. Not only does the sixth clause of the injunction expressly so state, but the opinion of the court at the hearing of the application for the injunction clearly justified the continuance of the picketing so long as it should not be done in a threatening and intimidating manner. The second clause impliedly permits persuasion of workmen by providing against the compelling or inducing of workmen to quit by threats, intimidation, force, or violence. In the same manner the third clause, by expressly restraining the prevention of persons becoming workmen by threats, intimidation, force, or violence, impliedly permits peaceful persuasion of would-be workmen. The first clause restrains interference, hindering, obstructing, or stopping the company's business, or its agents and employés therein. This paragraph must be construed to restrain only unlawful or malicious acts, not those incident

to a lawful combination of strikers, such as peaceful persuasion. The fourth clause properly restrains all acts in furtherance of conspiracy. The seventh clause, restraining interference with workmen going to and from work, must be limited to unlawful interference by coercion, intimidation, etc. Such construction follows from what has been said in regard to acts done by the unions or strikers for the promotion of their own legitimate interests, but which incidentally interfere with the business of the employer. At all events, whatever construction should be given to the injunction as a whole, it would be most unjust at this time, after the strikers have acted upon the injunction in view of the terms of the sixth clause permitting picketing, and upon the language of the court, to hold them to any rigid construction of its terms. Nor do I understand counsel for the complainant to take any such position against the unions or strikers, but only to contend that a conspiracy exists to maliciously injure the complainant by intimidation and violence. But, though interference by strikers causing damage may not be unlawful, and be permitted by the injunction, it is equally true that immunity ceases where coercion, intimidation, violence, or malicious interference with contract rights begin. Wabash R. Co. v. Hannahan, supra. Where peaceful picketing develops, as it generally does in a strike, into "strong, persistent, and organized persuasion," and social pressure of every description, making the condition of workmen disagreeable and intolerable, followed by hints of injury, veiled threats, offensive or abusive language, and occasional instances of assault and personal violence—all of which conditions are shown in the evidence in this case—then we have a condition condemned by the injunction, a compelling or inducing by threats, intimidation, force, and violence, the quitting of workmen, a preventing by threats, etc., workmen from entering the service, and the maintaining of picket lines in a threatening and intimidating manner. The condition has passed from that of the peaceful purpose of promoting the economic ends of the union men, and has entered the unlawful stage of malicious injury, without just cause or excuse, to rights just as important, and as fully protected by the Constitution, as those on whose behalf these acts are committed.

I understand the word intimidation to denote two kinds of coercion: (1) A threat by word or act of an individual, or by a combination of persons, to do something unlawful, reasonably calculated to compel the person threatened to do or not to do something; and (2) request or persuasion by or on behalf of a combination of persons to do or not to do something, resulting in coercion of the will from the mere force of numbers. In the first case the nature of the act, and the coercion, determine liability; in the second the conspiracy or concerted act and the coercion determine it. A. threatens B. with assault unless he quits work, and thus coerces him. A number of men, representing themselves and a larger number, request B. to quit work, and by the force of numbers coerce him to do so. Civil liability follows in both cases—in the first, from the nature of the act threatened; in the second from the coercion by force of numbers. In this case, however, it is unnecessary to go to the extent of holding

that coercion of the second description would be a violation of the injunction, as I find that the company's workmen, and those about to become workmen, were coerced by threats of unlawful acts. The view of the law herein expressed is not only the well-settled rule in the federal courts, and in Wisconsin by the decisions construing section 4466a of the Wisconsin Revised Statutes of 1898 (binding on this court), but is the strongly noticeable trend of decision both in England and the United States. Section 4466a reads as follows:

"Any two or more persons who shall combine, associate, agree. mutually undertake or concert together for the purpose of willfully or maliciously injuring another in his reputation, trade, business or profession by any means whatever, or for the purpose of maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act, shall be punished," etc.

See Randall v. Lonstorf, 126 Wis. 147, 105 N. W. 663, 3 L. R. A. (N. S.) 470; Martens v. Reilly, 109 Wis. 464, 84 N. W. 840; State v. Huegin, 110 Wis. 189, 85 N. W. 1046, 62 L. R. A. 700; Aikens v. State, 113 Wis. 419, 89 N. W. 1135; Aikens v. Wisconsin, 195 U. S. 194, 25 Sup. Ct. 3, 49 L. Ed. 154; Fischer v. State, 101 Wis. 23, 76 N. W. 594.

In the newspaper case above referred to (State v. Huegin), the managers of three newspapers combined to exclude from their newspapers the advertisements of all patrons who should pay an increased advertising rate demanded by a fourth newspaper, the Journal, unless the patron would advertise in all at such increased rate; but that any one declining to pay such higher rate might advertise in any or all at the old rate. It was argued that the agreement only shows a purpose to promote the interests of the contractors regardless of those of their competitors, and that section 4466a requires bad intent to injure in the sense of committing an actionable injury. It was held as follows: The malice required by the statute is malice in law, and not ill-will or malice in fact. It means an act done intentionally without just cause or excuse. If there was in the agreement an independent purpose to harm the Journal in its business, that is sufficient as regards the element of malice. The primary purpose, if not the only one, of the agreement, was to force the Journal to reduce its rates to the former price or lose custom. Either of the alternatives would cause it to lose money, and one of them would destroy its freedom of action, without benefit to the others.

Counsel argue that the agreement was one between independent contractors in their own business, to maintain prices at a particular level to promote their own interests. Even if this be true, it does not follow that the agreement was not criminal. Under section 4466a, a malicious purpose to injure is essential, otherwise it would not be a constitutional law. Several persons may combine to control prices for the purpose of promoting their own interests, and thus impoverish a rival in business, if there is no malicious intent to injure him, using the term malice in the sense of malice in law. All agreements to maliciously injure another are unlawful. A conspiracy to wrongfully injure another is actionable at the common law if it is so carried out as to cause damage, whether or not the person injured

would have had a remedy if the act had been done by a single person. The doctrine that an act which is not actionable if done by one is not when done by many is not the law of Wisconsin. A combination to produce injury not the incidental effect of the promotion of the legitimate interests of the members of the combination, is a conspiracy to inflict a malicious injury under section 4466a. The element of malice may make that act an actionable injury which would not otherwise be so. The union of individual forces by agreement, to accomplish injury, gives to such agreement or combination the character of a purpose to reach the end by violence, and the accomplishment thereof the character of a purpose effected by violence—citing Farmers L. & T. Co. v. N. P. Ry. Co. (C. C.) 60 Fed. 803; State ex rel. Durner v. Huegin, 110 Wis. 189, 85 N. W. 1046, 62 L. R. A. 700.

The Huegin Case was taken to the United States Supreme Court to test the constitutionality of section 4466a. The opinion was written by Justice Holmes, whose dissent in Vegelahn v. Guntner, 167 Mass. 92, 44 N. E. 1077, 35 L. R. A. 722, 57 Am. St. Rep. 443, has given rise to much comment in later cases. The statute was held not to violate the fourteenth amendment of the federal Constitution, providing that no person shall be deprived of liberty or property without due process of law. Justice Holmes lays down the following propositions: Malicious injury means to harm malevolently for the sake of the harm, and not merely as a means to some farther end legitimately desired. The intentional infliction of damage creates liability, unless the defendant had a just cause or excuse. A statute may properly punish a combination to do a malicious injury. Liberty of persons to combine in order to inflict malicious damage was not among the rights which the fourteenth amendment was intended to preserve.

The Durner Case limited the application of the statute to combinations with intent to do wrongful harm to another; and it is therefore not an unconstitutional enactment. Aikens v. Wisconsin, 195 U. S. 194, 25 Sup. Ct. 3, 49 L. Ed. 154. I conclude, therefore, that where persuasion reaches the stage of intimidation and coercion, as I believe it has in this case, it becomes malicious injury if harm or damage results, and is within section 4466a, as thus construed by the courts of Wisconsin and the Supreme Court of the United States. It will be seen that in the Huegin Case, as well as in Quinn v. Leathem and Temperton v. Russell, cited later, the plan was to injure another by means which could not benefit the defendants, at least in any readily understandable way; thus excluding all just cause and excuse. Any such benefit was either illusory, or so remote as to be unimportant.

In Fischer v. State, 101 Wis. 23, 76 N. W. 594, a prosecution was brought under section 4466c, for maliciously attempting to hinder working men from continuing at work, charging that defendant, who was agent of a trade union, said to the men:

"You cannot build this building. I will fight it if it takes all summer; and, if your city will not protect us, we will get the militia."

The complaint was sustained.

The important case of Randall v. Lonstorf et al., 126 Wis. 147, 105 N. W. 663, 3 L. R. A. (N. S.) 470, settles the rule for Wisconsin

that an act lawful when done by one person may be actionable when done by two or more in combination, and is a construction of section 4466a which is binding on the federal court. The Supreme Court had held in Lonstorf v. Lonstorf, 118 Wis. 159, 95 N. W. 961, that a mother-in-law was not liable for alienating from the wife the affection of the husband. In Randall v. Lonstorf and others the general guardian of the wife, who was then insane, brought an action for damages against the same defendant and others, charging a conspiracy to prevent the wife from performing her marital duties, from living with him, receiving support, etc., thus breaking the marriage contract. A demurrer at the trial was sustained by the court, but reversed on appeal. It was held that both the motive or object was unlawful at the common law, and criminal under section 4587c, prescribing a penalty for the abandonment of wife or child. Further it was held that the means employed were unlawful and criminal by section 4466a, and that defendants were liable. The general rule was laid down that an act not criminal or actionable when done by one may become both if done by many. The same conclusion has been reached in the lower federal courts. Atchison, etc., Ry. Co. v. Gee (C. C.) 139 Fed. 582; Allis-Chalmers Co. v. Reliable Lodge (C. C.) 111 Fed. 264; American Steel & Wire Co. v. Wire Drawers' Union (C. C.) 90 Fed. 608; Union Pacific Ry. Co. v. Ruef (C. C.) 120 Fed. 102; In re Doolittle (C. C.) 23 Fed. 545; Casey v. Cinn. Typ. Union (C. C.) 45 Fed. 135, 12 L. R. A. 193; Thomas v. Cinn. etc., Ry. Co. (C. C.) 62 Fed. 803; Arthur v. Oakes, 63 Fed. 310, 11 C. C. A. 209, 25 L. R. A. 414; Loewe v. California State Federation (C. C.) 139 Fed. 71; Hawarden v. Youghiogheny Coal Co., 111 Wis. 545, 87 N. W. 472, 55 L. R. A. 828.

In England there is the same tendency to reach the conclusion that the motive is all important in cases of this kind, that an act not unlawful, when done by one, may be so when done by a combination of persons; and that Allen v. Flood, L. R. (1898) App. Cas. 1, must be considerably limited, and is noticeable in the more recent cases. The very important case of Allen v. Flood held, in effect, that one who persuades another by argument, and possibly with some hint of threat, to abandon a contract contemplated with a third person, is not liable, even if he intended to injure the third person, and actual injury resulted. The majority of the judges in the House of Lords thought that the defendant did not threaten a strike, or increase the probability of it in the minds of the employers, who, fearing a strike, discharged the plaintiffs. Allen v. Flood has been quite generally criticised, severely so in State v. Huegin, supra, and is broadly distinguishable from cases of combination like this; the act there in question being that of an individual.

In Quinn v. Leathem, L. R. (1901) App. Cas. 495, the element of conspiracy was present. Defendants (Quinn et al.) were officers of a trade union. All its members were required to assist fellow members to obtain work. Plaintiff (Leathem) had a number of nonunion workmen. At a meeting of the union, plaintiff offered to pay the dues and fines of his workmen if admitted as members, but the union would not admit them, and warned him that he must discharge them. He could

have complied without breaking any contract, as he employed the men by the week, but he refused. The union then told one Munce, who bought meat of the plaintiff, but had no contract with him, that they would order a strike in his shop if he continued dealing with plaintiff, whereupon he stopped taking any more meat of plaintiff. Plaintiff sued the officers of the union, and recovered, and the judgment was affirmed by the House of Lords. The case is identical with the second claim in Temperton v. Russell, 1 Q. B. 715, relating to the preventing of persons accepting work. There was a combination to injure; Munce was coerced by the union. A conspiracy to injure is actionable. Any act done in furtherance is wrongful.

In the recent case of South Wales Miners' Federation v. Glamorgan Coal Co. L. R. (1905) App. Cas. 239, usually called the "Stop-Day Case," miners employed in collieries, without notice to their employers, and in breach of their contracts, abstained from work on certain days upon the direction of a federation of miners. The federation acted honestly and without malice or ill-will to the employers, and with the object of keeping up the price of coal by which the wages were regulated. Held that the federation was liable for damages, no justification for their act being shown. In the opinion of Justice Lindley, it is said that an organized body of men working together can produce results very different from those which can be produced by an individual without assistance. Laws adapted to individuals require modification and extension if they are to be applied with effect to large bodies of persons acting in concert. This is the basis of the law of conspiracy. The power of trade unions to intimidate and coerce is undoubted, its exercise comparatively easy and probable; but proof must, nevertheless, in each case, be produced. The fact that the power exists, and is easily exercised, does not justify a legal presumption that such power has been or will be abused. An act regulating trade unions, and providing they shall not be liable for damages, has just gone to final passage in the House of Lords.

The case of Huttley v. Simmons (1898) 1 Q. B. Div. 181, decided just after Allen v. Flood, holds that a combination of cabmen to prevent another from being employed, gave the latter no right of action; the act being excused on the ground of the competition of labor against labor. Like Allen v. Flood, its authority has been shaken by Quinn v. Leathem and the Stop-Day Case, and it is criticised in State v. Huegin, 110 Wis. 189, 258, 85 N. W. 1046, 62 L. R. A. 700. Allen v. Flood has been followed in Canada. Perrault v. Gautier, 6 Quebec Q. B. 65.

In Massachusetts, after some diversity of opinion due to the views of Justice Holmes, then Chief Justice of the Massachusetts Supreme Court, it is settled, in a number of important cases, that picketing, organized pressure, indirect threats of harm, although there be no express intimidation, and although the language used be courteous and gentlemanly, amount to intimidation, and are unlawful, not justified by the motive of economic benefit to the union. Vegelahn v. Guntner, 167 Mass. 92, 44 N. E. 1077, 35 L. R. A. 722, 57 Am. St. Rep. 443; Plant v. Woods, 176 Mass. 492, 57 N. E. 1011, 51 L. R. A. 339, 79

Am. St. Rep. 330; Berry v. Donovan, 188 Mass. 353, 74 N. E. 603, 108 Am. St. Rep. 499.

In Martell v. White, 185 Mass. 255, 69 N. E. 1085, 64 L. R. A. 260, 102 Am. St. Rep. 341, it was decided that where an injury is intentionally inflicted, the crucial question is whether there is justifiable cause for the act. If inflicted without just cause or excuse it is actionable. The justification must be as broad as the act, and must cover, not only the motive and the purpose, or in other words the object sought, but also the means used. Where there is an apparent conflict between two rights—the right of workmen to pursue their own economic advantage, and the rights of the employers to carry on their business as they choose, both are to be sustained within proper bounds, and one must yield to the other as the facts of the case point out. Where a by-law of a manufacturers' association, applying only to members, provided a considerable fine upon any one who should trade with a nonmember, and some fines were collected of members for trading with plaintiff, a nonmember, resulting in damage to plaintiff's trade, defendants were held liable. In a suit against the association (all its members being joined), it was contended that the acts were done with just cause and excuse, to enable the members to compete more successfully with others in the business, and thus promote their own business interests, and with no intention or desire to injure plaintiff except so far as such injury was the necessary result of the measures taken for their own interests. Held that the motive sought (the object) was thus not unlawful. But as to the means used: "A combination may make oppressive or dangerous that which, if it proceeded from a single person only, would be otherwise, and the very fact of the combination may show that the object is simply to do harm, and not to exercise one's own just rights." Mogul Case, 23 Q. B. D. 598. The right of competition rests upon the doctrine that the interests of the great public are best served by permitting the general and natural laws of business to have their full and free operation. But the trader has not a free lance. Fight he may, but as a soldier, not as a guerrilla. No man can justify interference with another man's business through fraud nor by intimidation, molestation, or obstruction. Here the members were coerced by fines; that is, by actual or threatened injury to their property. This is arbitrary and artificial, based in no degree on competition. Martell v. White, 185 Mass. 255, 69 N. E. 1085, 64 L. R. A. 260, 102 Am. St. Rep. 341; see, also, Morasse v. Brochu, 151 Mass. 567, 25 N. E. 74, 8 L. R. A. 524, 21 Am. St. Rep. 474. And quite generally, it may be said, the courts have adopted the rule that a malicious injury to another, inflicted without just cause or excuse, causing damage, is actionable, as well as a combination of persons to so injure. State v. Glidden, 55 Conn. 46, 8 Atl. 890, 3 Am. St. Rep. 23; State v. Stockford, 77 Conn. 227, 58 Atl. 769, 107 Am. St. Rep. 28; Beck v. Railway Union, 118 Mich. 497, 77 N. W. 13, 74 Am. St. Rep. 421, 42 L. R. A. 407; U. S. Heater Co. v. Moulder's Union, 129 Mich. 354, 88 N. W. 889; Chipley v. Atkinson, 23 Fla. 206, 1 South. 934, 11 Am. St. Rep. 367; Lucke v. Clothing Cutters, 77 Md. 396, 26 Atl. 505, 19 L. R. A. 408, 39 Am. St. Rep. 421;

Purington v. Hinchliff, 219 Ill. 159, 76 N. E. 47, 2 L. R. A. (N. S.) 824; Erdmann v. Mitchell, 207 Pa. 79, 56 Atl. 327, 63 L. R. A. 534, 99 Am. St. Rep. 783; Delz v. Winfree, 80 Tex. 400, 16 S. W. 111, 26 Am. St. Rep. 755; Longshore Ptg. Co. v. Howell, 26 Or. 527, 38 Pac. 547, 28 L. R. A. 464, 46 Am. St. Rep. 640; Cumberland Glass Mfg. Co. v. Glass Bottle Blowers' Union, 50 N. J. Eq. 49, 46 Atl. 208; Curran v. Galen, 152 N. Y. 33, 46 N. E. 297, 37 L. R. A. 802, 57 Am. St. Rep. 496.

For cases where the motives of defendants were held to be only to obtain their own economic benefit, without any malicious intent to cause damages, and where the resulting injury was incidental, no violence being employed, see Mogul Steamship Co. v. McGregor, L. R. 23 Q. B. 598 (1898) App. Cas. 25; Macauley Bros. v. Tierney, 19 R. I. 255, 33 Atl. 1, 37 L. R. A. 455, 61 Am. St. Rep. 770; Wabash R. Co. v. Hannahan (C. C.) 121 Fed. 563; Bohn Mfg. Co. v. Hollis, 54 Minn. 223, 55 N. W. 1119, 21 L. R. A. 337, 40 Am. St. Rep. 319; National Protective Ass'n v. Cumming, 170 N. Y. 315, 63 N. E. 369, 58 L. R. A. 135, 88 Am. St. Rep. 648; Boyer v. W. U. Tel. Co. (C. C.) 124 Fed. 246; Jacobs v. Cohen, 183 N. Y. 207, 76 N. E. 5, 2 L. R. A. (N. S.) 292; People v. Marcus (N. Y.) 77 N. E. 1073. The conclusion to be drawn from the cases, as applicable to this controversy, is, I think, that the combination of the defendant unions, their members and the defendant O'Leary, to strike, and further to enforce the strike and if possible to bring the employers to terms by preventing them from obtaining other workmen to replace the strikers, was not unlawful, because grounded on just cause or excuse, being the economic advancement of the union molders, and the competition of labor against capital. The unions, strike committee and picket captains instructed the men to use only peaceful means, not to follow workmen; to leave them unless they were willing to talk, etc.

In questioning some of the defendants here, in cases in the state court, questions were put like this: Would you say that all the other storekeepers in Milwaukee would have a right to place a lot of men opposite Gimbel's store (a large department store in Milwaukee), and speak to people going in and out there, and tell them not to go in there and buy, do you think they would have the right to do that? One witness answered this question, "Yes, so long as they did not block up the streets." The answer of the witness is nearly accurate. It is difficult to conceive of a picket line big enough to use peaceable persuasion upon the customers of a large department store which would not block the streets, and be an intolerable public nuisance.

Coming now to the question whether the picketing was maintained in a threatening and intimidating manner, were the workmen coerced by threats of unlawful acts to quit work, or not to enter service? Were they so coerced by individual acts or by a combination of persons with threats of personal injury, etc.? Excluding the case of coercion by mere force of numbers without threats of unlawful acts, as indicated above? Were the acts of the pickets, and those aiding them, reasonably calculated to constrain, overcome the will, destroy freedom of action, coerce the volition, by putting the workmen in fear of injury

by violent means? It is established by the evidence that the conduct of the pickets calculated to pursuade, induce, or force the workmen, consisted entirely of the concerted action of two or more. The pickets were in groups of two, four, six and sometimes more. Their words and acts, as well as the silent but powerful influence of the badges or buttons were all on behalf of the unions, for the benefit of union molders, the asserted betterment of labor conditions as represented by the unions. Indeed, as has been already said, this benefit to the cause of union labor is the only just cause or excuse which could relieve their acts from the charge of illegality; this is the only way they can possibly justify combined interference with the company's business. Consequently, acts of interference, obstruction, organized, constant and persistent persuasion, social pressure and similar methods, when they reach such a point as to be clearly and (in a criminal case) beyond reasonable doubt coercion, making the situation of the workmen so unpleasant, disagreeable, and intolerable that they are constrained to quit work or not go to work, are unlawful, even though there is no direct or positive threat to do an act in itself unlawful. The combination or concert of action, resulting in coercion, stamps conduct as illegal, without such a threat of harm or bodily injury as would be necessary to make intimidation by one illegal. Quinn v. Leathem (1901) App. Cas. 530; State v. Huegin, supra.

In this case, after giving full scope to the presumption of innocence and the rule of reasonable doubt, I am thoroughly convinced that intimidation has been shown, mainly by coercion through constant threat of unlawful harm, exerted by the concerted action of the pickets. The picket line has been systematically, constantly, and long maintained. The pickets have officers, a marshal, and picket captains, and they wear emblems of authority, white picket buttons. While the use of these buttons was suggested by the court when granting the injunction, to afford means of detection of those committing unlawful acts, and thus designed to deter violations of the injunction, yet, although they may have been of use in this respect, they have, on the other hand, much increased the efficiency and pressure of the coercion. These buttons, like the uniform of the soldier, are emblems of a mysterious and powerful organized authority, and greatly increased the potency of the picket line. The pickets were always on hand, exercising constant, systematic, and persistent pressure. The workmen were followed, surrounded, jeered at, and insulted. One witness says the pickets would follow workmen to the car, circle 'round them, pretend they were going to take the car, "and then they would give us the laugh." To protect the workmen from annoyance, molestation, and violence, guards were employed to conduct them back and forth, special street cars hired, and, in some cases board and lodging provided in the foundries. Numbers of workmen complained of being afraid of injury, many refused to work, and others threatened to quit unless protection was given. The city police force about the foundries was increased. There were many specific acts of violence, vile and offensive language, threats of injury and bodily harm, and one homicide. The workmen became terrorized and intimidated, resulting in serious injury to the employer. It is said that there have been many arrests

and convictions of nonunion workmen for the crime of carrying concealed weapons, but this is only additional evidence that the men feared bodily harm. Under these circumstances it makes no difference that the pickets, as a general rule, spoke politely to the workmen. Under such circumstances, the mere constant presence of the pickets, their buttons, and numbers, even if they said nothing, would carry with it constant threat, producing fear and alarm among the workmen. After the threats and particular acts of express intimidation shown, the same persons would again appear as pickets, carrying terror from their mere presence. It is like the instance of one of the students at a certain University, engaged in hazing a freshman, who said, in a tone of polite remonstrance: "Don't on any account put him in the lake." The pickets were always "willing to wound," and not always "afraid to strike." Thus the picketing was maintained in a threatening and intimidating manner, in violation of the sixth paragraph of the injunction; also in violation of the second paragraph, restraining the constraint of workmen to quit by threats, intimidation, force, or violence; also the fourth and seventh paragraphs restraining all acts in furtherance of conspiracy and unlawful interference with workmen. A simple "request" to do or not to do a thing, made by one or more of a body of strikers under circumstances calculated to convey a threatening intimation, with a design to hinder or obstruct workmen, is unlawful intimidation, and not less obnoxious than the use of physical force for the same purpose. In re Doolittle (C. C.) 23 Fed. 545. A like method of "peaceful picketing" is vigorously condemned by Judge McPherson, in Atchison R. Co. v. Gee (C. C.) 139 Fed. 582.

Lyons v. Wilkins, L. R. (1896) Ch. 811 (1899) Ch. 255, is the leading English case on picketing, which is there regulated by statute. An injunction was issued restraining the "watching or besetting the plaintiffs' works for the purpose of persuading or otherwise preventing persons from working for them, or for any other purpose except merely to obtain and communicate information." The case is not, however, a precedent in this country, because the injunction substantially follows the language of section 7 of the act of 1875 (St. 38 & 39 Vict. c. 86).

"The men who walk up and down in front of a man's shop may be guilty of intimidation though they never raise a finger or utter a word. Their attitude may, nevertheless, be one of menace. They may intimidate by their numbers, their pleadings, their methods, their circulars and their devices." Crump v. Commonwealth, 84 Va. 927, 6 S. E. 620, 10 Am. St. Rep. 895. See, also, U. P. R. Co. v. Ruef (C. C.) 120 Fed. 102; Beck v. Teamsters' Union, 118 Mich. 497, 77 N. W. 13, 74 Am. St. Rep. 421, 42 L. R. A. 407; O'Neil v. Behanna, 182 Pa. 236, 37 Atl. 843, 38 L. R. A. 382, 61 Am. St. Rep. 702; Vegelahn v. Guntner (Mass.) 44 N. E. 1077, 35 L. R. A. 722, 57 Am. St. Rep. 443; Coons v. Chrystie (Sup.) 53 N. Y. Supp. 668. All these cases condemn peaceful picketing, and hold it to be unlawful.

There can be no doubt, as it seems to me, that the constant and regular maintenance of the pickets after repeated acts of violence by pickets, the use of abusive epithets, the creation of an unfriendly atmosphere

surrounding the workmen, with the other conditions mentioned, constitutes a clear case of a conspiracy among the pickets to unlawfully intimidate and coerce the workmen. While I do not find a conspiracy on the part of the unions at the beginning of the strike, yet I am satisfied from the testimony that all the pickets afterwards combined and conspired to intimidate workmen, and that such conspiracy existed at the time of filing the original bill in this case. I find a conspiracy existed as defined by section 4466a, Rev. St. Wis. 1898, as construed and limited by the Supreme Courts of Wisconsin and the United States. It still remains to consider what particular pickets should be punished for violation of the injunction, whether their officers and the strike committee should be so punished, and whether the unions are shown to have become identified with the conspiracy of the pickets, or can in any event be punished.

As to the unions: I shall assume, without particularly examining the evidence, that it sufficiently appears that the unions, by their continued support of the strike through the strike committee, and otherwise, have approved of the picketing as actually carried on. Upon this assumption, it becomes necessary to consider whether the unions, as unincorporated voluntary associations, can be made parties to a suit, fined, or punished for violating an injunction. A trade union, in this state, is simply an assemblage of persons. It is in no manner recognized by the law as an entity separate from its members, except to the extent that a partnership is so recognized. No statute has permitted it to sue or be sued in its common name. Its members may sue or be sued, either by joining all of them or one or more for all, where the members are so numerous that it is impracticable to bring them all in, but it is the suit of the members, not of the union. I have no doubt that an injunction may properly go against a trade union by name, and will operate to restrain all of its members who have knowledge of it; Consolidated Steel & Wire Co. v. Murray (C. C.) 80 Fed. 811; United States v. Coal Dealers' Ass'n (C. C.) 85 Fed. 252, 260; but that is a very different thing from fining the union, or rendering judgment for damages against it. It is also true that such a judgment or fine may go against a trade union in England; but this liability has been taken away by the statute passed in December, 1906. In the "Stop-day" Case above cited the Miners' Federation was fined 23,000 pounds; but trade unions have long been recognized and given many and important rights and powers by various acts of Parliament.

The bill of complaint names four unions as defendants, and 59 individual members of such unions, and alleges that some of the defendants are also officers of the unions. It does not expressly make the individual defendants parties on behalf of the unions, nor indicate which defendants belong to a particular union. A general appearance was entered in the names of the four unions and the individual defendants, who all answered the bill. Such appearance of course operated as a waiver of any objection of nonjoinder of parties. After such general appearance the defendants could not stop the proceedings until other parties defendant should be brought in, or claim any relief on the ground that indispensable parties had not been joined. But

this is the full extent of the waiver. It could not operate to bring in persons not named as parties. Individual members of the unions not mentioned in the bill, or sued either in a personal or representative capacity, were not, by the general appearance of all the defendants, brought in or joined in any manner.

The status of persons represented in equity suits by others is discussed in Pomeroy's Remedies, §§ 396–398 of the second edition and in Code Remedies, §§ 296, 297. It appears from his discussion that such represented parties plaintiff are not actually before the court unless they assent in some way; though a slight act of assent is enough; nor are they bound by the decree without such assent. As to represented defendants, he says that where the proceedings assume a hostile character, even as to a represented plaintiff, he must either have taken the steps necessary to make him an actual party, or, having notice and an opportunity to come in, he refuses or neglects to do so. And he lays down the same rule as to defendants. The matter, however, seems to be set at rest by Equity Rule 48, which follows:

"Where the parties on either side are very numerous, and cannot, without manifest inconvenience and oppressive delays in the suit, be all brought before it, the court in its discretion may dispense with making all of them parties, and proceed in the suit, having sufficient parties before it to represent all the adverse interests of the plaintiffs and defendants in the suit properly before it. But in such cases the decree shall be without prejudice to the rights and claims of all the absent parties."

It will be seen that the decree does not bind the absentees or represented defendants, as it is required to be made without prejudice to their rights. See Coann v. Atlanta Cotton Factory (C. C.) 14 Fed. 4. No case was cited on the argument in which a judgment or decree for damages, or a fine for contempt of court, went against an unincorporated society or trade union, except Barnes v. Chicago Typographical Union, where Judge Holdom of the superior court of Cook county, Ill., imposed a fine of $1,000 upon the defendant union, which was composed of 2,800 members, was named as a party defendant, and whose officers and executive committee were also joined as defendants. The case is now pending on appeal in the Appellate Court of Illinois. In the Racine Boycott Case, decided by Judge Fowler, judge of the Eighteenth Wisconsin circuit, August 27, 1906, the final injunction went against the unions, but the decree for damages was limited to individual defendants. In Guilfoil v. Arthur, 158 Ill. 600, 41 N. E. 1009, and Fitzpatrick v. Rutter, 160 Ill. 282, 43 N. E. 392, there was no personal judgment against the union. See, also, Franklin Union v. People, 220 Ill. 355, 77 N. E. 176, 4 L. R. A. (N. S.) 1001, 110 Am. St. Rep. 248, and Flannery v. People, 225 Ill. 62, 80 N. E. 60.

"A voluntary association, unincorporated, which is not organized to carry on some trade or business, or to hold property in this state, and does not in fact carry on a trade or business or hold property therein, cannot sue or be sued as such. Railroad Co. v. Dick, 7 Neb. 246. The individual members are to be sued in such cases, not the association." Cleland v. Anderson, 66 Neb. 252, 92 N. W. 306, 96 N. W. 212, 98 N. W. 1075. The St. Paul Typothetæ, an association of em-

ployers formed to promote and protect the firms, corporations, and persons composing it in controversies with their workmen, and the St. Paul Bookbinders' Union, a trade union formed for similar purposes, cannot sue or be sued in the association name. "It is well settled that, in the absence of a statute otherwise providing, to be entitled to conduct judicial proceedings in court, a party litigant must be either a natural or artificial person." They have no legal entity distinct from that of their numbers. "The rule is followed by an unbroken line of authorities, though a different rule has been applied in many of the courts in actions purely of an equitable nature." Citing Niblack on Soc. and several cases; 22 Pl. & Pr. 242; St. Paul Typothetæ v. St. Paul Bookbinders' Union, 94 Minn. 351, 102 N. W. 725. Voluntary association cannot be made liable to a personal judgment in an equity suit to foreclose a lien. M. E. Church South v. Clifton (Tex. Civ. App.) 78 S. W. 732. Suit may be brought against two or more members of a voluntary association to represent the interests of all. Pearson v. Anderburg, 28 Utah, 495, 80 Pac. 307; Niblack on Soc. 181.

I think therefore that no fine can go against the unions named and who have answered as defendants.

In respect to the punishment of individual defendants who have been served with process or have appeared, for participating or taking part in the picketing or any particular act of intimidation or coercion, it is clear that those members of the strike committee who have been made parties and were served or appeared on the order to show cause are also liable to be punished for violating the injunction. As to the defendants William Schwab and Henry Harbicht, I am not clear that they have so aided or supported the picketing as to show beyond reasonable doubt that they should be punished, and will determine this on further hearing. Those defendants who, although they have done picket duty, yet are not shown to have taken part in any specific act of coercion or intimidation, will only be punished by a nominal fine. Being members of the picketing combination, the act of any one picket is technically the act of all, but this will not make them liable to more than a nominal fine. The marshal and captains of the pickets at the three foundries, so far as they are before the court, have clearly violated the injunction by maintaining the picket system, and should be punished accordingly. William Henning, Joseph Jagozinski, John Schmitt, Anton Gutkowski, William Weimer, Peter William Nielen, Albert Kubatzki, Hasse and possibly Kramer (if brought in), should be punished for violating the injunction by committing the specific acts of intimidation shown by the testimony as herein referred to, as well as any other person (if any) before the court who is clearly shown to have taken part in such arts. Andrew Paulsen should not be punished, except as he may be included among those pickets as to whom a nominal fine will be imposed.

In regard to the punishment of persons who are not made parties defendant, but who have been brought into the contempt proceedings as having violated the injunction after having obtained notice of it, I adopt the rule stated by Judge Kohlsaat in Employers' Teaming Co. v.

Teamsters (C. C.) 141 Fed. 679. A further hearing for the purpose of argument will be necessary in order that the proper punishment may be fixed, and the proper persons who have violated the injunction clearly ascertained, and also as to the liability of the defendants Harbicht and Schwab. At the same time the question of costs in favor of those cited in these proceedings, who have already been or should hereafter be entirely dismissed from the proceedings, will be disposed of. The necessity of a formal finding of facts and conclusions will also be considered at the same time.

NOTE.—In Flannery v. People, supra, several of the defendants had been sentenced to imprisonment for contempt, and after the decrees were affirmed, and on January 17, 1907, they commenced serving their terms. They were convicted of the violation of an injunction, and an order continuing it, issued on a bill in equity filed in the superior court of Cook county, in the name of Chicago Typothetæ, an unincorporated trade union, against Franklin Union (incorporated) and others. The bill recited that it was brought on behalf of nine members of the union, who signed and sealed a paper, attached to the bill, requesting it to be filed in the name of the union. An injunction was issued at the time of filing the bill. The defendants Flannery and others appeared and answered. Six weeks after filing the bill the court gave leave to amend it by joining as complainants all the persons who signed the written statement and one other, and by the same order the injunction was continued. Flannery and others were convicted of violating both injunctions. Flannery and Shea, two of those undergoing imprisonment, applied to the United States Circuit Court for the Northern District of Illinois for a writ of habeas corpus, alleging that they were deprived of their liberty without due process of law, on the ground that the superior court had no jurisdiction to issue the injunction, or allow the amendment, because no person was named as complainant. They relied on the cases cited above, and Proprietors of the Mexican Mill v. Yellow Jack Silver Min. Co., 4 Nev. 40, 97 Am. Dec. 510, Barbour v. Albany Lodge, 73 Ga. 474, Richardson v. Smith & Co., 21 Fla. 336, Seely v. Schenck & Denies, 2 N. J. Law, 75, Steamboat v. Wilson, 11 Iowa, 479, and Steamboat Burns, 9 Wall. 237, 19 L. Ed. 620. The writ was quashed and the petition dismissed February 25, 1907.