Margaret O'Neil, doing business as the Fayette City Coal Works, Appellant, *v.* Noah Behanna, George Hupp, John H. Wilson, Charles Wilson, Jr., Michael O'Neil, Robert I. Johnson, William Johnson, John Biles, J. N. Furlong, William T. Spalter, Jacob Carr, Frank Lowers, Link Lowers, Hugh McDonald, James McPherson, Thomas Haywood, Frank Bruce, James A. Jacobs, Charles Jacobs, Frank Jacobs and Paul Lamak.

*Equity—Injunction—Strikes—Display of force—Intimidation.*

A display of force by strikers against laborers who wish to work, such as surrounding them in large numbers, applying opprobrious epithets to them and urging them in a hostile manner not to go to work, though no force be actually used, is as much intimidation as violence itself. Such conduct will be restrained by injunction, and the actors will be liable in damages to the employer of the laborers.

Where new men, employed to take the place of strikers are on their way to work, their time cannot be lawfully taken up and their progress interfered with by the strikers on any pretense or under any claim of right to argue or persuade them to break their contracts.

On a bill in equity for an injunction to restrain strikers from interfering with men employed in their place, the evidence showed that the new men were followed from their point of embarkation to their destination and importuned not to work; that they were met by the strikers in considerable numbers and called "scabs" and "blacklegs;" that they were sometimes surrounded, and efforts were made to pull them away. *Held,* that the plaintiff was entitled to an injunction.

Where a bill has been filed against strikers for an injunction and for damages for injuries caused by their illegal conduct, the plaintiff has a right to proceed with the case after the strike is over, for the purpose of recovering damages, and it is improper for a judge to express from the bench an opinion that the case should have been dropped.

Argued May 11, 1897. Appeal, No. 69, Jan. T., 1897, by plaintiff, from decree of C. P. Fayette Co., No. 187, in equity. Before GREEN, WILLIAMS, MITCHELL, DEAN and FELL, JJ. Reversed.

Bill in equity for an injunction against strikers, and to recover damages for injuries caused by the alleged illegal conduct of strikers.

The case was referred to W. F. Johnson, Esq., as master, who reported in favor of dismissing the bill.

The court, in an opinion by EWING, P. J., sustained certain exceptions to the master's report, and imposed part of the costs on part of the defendants, but allowed plaintiff no damages. The opinion was as follows:

This proceeding was instituted with a twofold purpose, viz: first, to enjoin the defendants from interfering with, obstructing and preventing the employment of miners at the Fayette City Coal Works and the operation of said works, and, secondly, to recover from the defendants damages alleged to have been sustained in consequence of their unlawful acts. The master has found against the plaintiff upon both these points and recommended the dismissal of the bill at plaintiff's cost. Of this action the plaintiff now complains, and excepts both to the findings of fact and the legal conclusions of the master.

Very careful and repeated examinations of the testimony have shown that there is merit in some of the exceptions relative to the facts of the case. The master has reported that, while the defendants were combined and engaged in an effort to prevent the operation of said works at reduced wages to the miners, they yet conducted their contest in a perfectly legal, orderly and peaceable manner. But the testimony certainly establishes the fact that certain of the defendants overstepped these bounds, and used annoyance, intimidation, ridicule and coercion to prevent new men from engaging in work for the plaintiff. When the new men were followed and importuned not to work from their point of embarkation to their destination, and there met by the strikers in considerable numbers and followed to their lodging places, all the time being pressed and entreated to return, and called "scabs" and "blacklegs," and sometimes surrounded and the effort made to pull them away, an unfriendly (at least) atmosphere about everywhere, it must be admitted that there was something more than mere argument and persuasion, and the orderly and legitimate conduct of a strike. This was certainly serious annoyance and well calculated to intimidate and coerce. And that effect was apparently produced on more than one occasion. Nor did such acts entirely end when the men imported actually began work, but such men

were, on occasions and in a less public manner, approached in a like manner in their intervals of labor, and advised that there would be trouble there, and they had better leave, etc. No actual violence, however, was employed, and the evident determination of the defendants was to abstain from and prevent the employment of physical force. But, until the hearing on the 11th of March, 1893, some believed they could do almost anything in the furtherance of their plans except that; and, to their credit be it said, after they were advised to the contrary on that day, they appear to have refrained from any action, although still intent upon their original purpose to which any just exception can be taken. Their mistake was in not having fully acquainted themselves as to the extent they could lawfully go in the first instance.

But the unlawful acts mentioned were not participated in nor abetted by all the defendants, and all, although present on one or more occasions, should not be held responsible therefor. For the avowed purpose of the strikers was to maintain their rights and position wholly within legal lines, and this they insisted upon; and that some of the more zealous of their number went beyond that mark without any common consent or understanding, should not, under the circumstances, militate against the more conservative of their number who refrained from any act and any participation in and encouragement of any act of intimidation or coercion disclosed by the testimony. No stress can be properly laid on the fact of the presence of these parties or any of them at the landing when the importations arrived, for it must be remembered that in small towns people are prone to congregate about depots and wharves at train and boat times, and particularly so when large proportions of the citizens are idle. Curiosity leads many at times to places when they would better stay away, but they are not for that reason to be regarded as implicated in all the disorder that may there occur. Nor are all the parties together engaged in a lawful purpose, to be avowedly accomplished in a lawful manner, to be visited with the unauthorized and illegal acts of their associates, although committed in the prosecution of the common work. Moreover, those of the defendants shown by the testimony to have engaged in these acts of intimidation, etc., were evidently the leading spirits in the active work, and it is proper

that they, rather than the rank and file, should account for what may have been done that should have been left undone, and for which they are peculiarly responsible.

The defendants proved to have thus intimidated and coerced, and annoyed and ridiculed the men brought to labor at these coal works are Noah Behanna, George Hupp, Michael O'Neil, Robert I. Johnson, Wm. Johnson, Wm. T. Spalter, Jacob Carr, James McPherson and Thomas Haywood. One or two of the others may be equally involved, but the testimony is not satisfactory as to them. Of those above named only one, Noah Behanna, requires any special mention. He was a policeman in Fayette City at the time, and it was peculiarly his duty, not only to strictly abstain from any participation in this trouble, and most particularly from aiding and abetting in the acts of intimidation, etc., but actively and positively to protect and screen the new men from any and all such attacks. Instead of that he is shown to have encouraged the strikers in all their acts, to have himself advised new men to leave, and predicted trouble if they did not, and on every occasion to have thrown his influence and that of his office actively against the new men and in behalf of the old. That his sympathy was on the side of the strikers is not to be wondered at, but he had no more right than have we to permit that to influence him in the discharge of his plain duty, much less to allow it to induce him to participate in illegal acts. His office should have alone dictated his course.

On the question of damages the master is clearly right for various reasons. In the first place, these works are owned not by Margaret O'Neil, the sole plaintiff, alone, but by her and Colonel O'Neil (whoever he may be) as shown by the testimony and defendants' brief, so that any damages are not the right of the plaintiff alone. She is the principal owner, but not the sole owner, and it does not appear that the other owner is even advised of this proceeeding. But, apart from that, part, and by far the greater part, of the claim for damages is so preposterous as to be wholly devoid of merit, and the remainder is not so proved and shown as to put it in any shape to be understood and ascertained. It must be remembered that in September, 1892, a reduction in wages was made at these works, and that the miners were not willing to accept said reduction, and they quit

work in a body. No effort was made to supply their places or start the works until February, 1893, and yet the plaintiff claims heavy damages from these defendants for loss of trade and injury to the mines, etc., when idle, simply because the miners saw fit to refuse to labor at the reduction made in their wages. And of the defendants named as having intimidated, etc., the new men brought there in February, 1893, only one of them, Michael O'Neil, was working for the plaintiff in September, 1892, when the reduction was refused and the works stopped, and some of the others had never worked there. The men had a perfect legal right to refuse to work at the reduction, and if, in consequence, the works were injured and trade lost it is damnum absque injuria, nothing more. The remainder of the claim is for expenses in obtaining new men and bringing them to the works, for boarding them there and for the cost of employing police and deputy sheriffs, etc., in February and March, 1893. It might be that for expenses incurred in bringing in new men who were driven away by illegal conduct of the defendants, and for the cost of peace officers whose presence was required by like conduct of the defendants, the owners of these works would be entitled to recover as against the defendants guilty of such conduct; but for boarding their employees and the expenses of those who remained, etc., there can be no valid claim. And yet all these matters are bunched together in the bills presented, and aggregated with items for advertising for miners and similar charges, so that it is impossible to identify any expense or item of damage in connection with the illegal acts from the testimony, in order to warrant a finding that it was occasioned by any particular act of any defendant, or the illegal conduct of any number of them. Nor does it appear, even, just when any particular deputy was employed, nor how long he was retained, nor indeed the actual date when resumption of work was attempted. And since the reprehensible conduct of the defendants extended only from about the middle of February (if, indeed, it was not some ten days later) until March 11, it will be seen how utterly impossible it is from the proof given to even formulate anything like a correct and legitimate damage claim against these defendants. The dates given in the exhibits are presumably those of payment, but when were the expenses actually incurred and what relation do the defendants bear to them?

There is nothing to show. The damage claim, however, is not understood to be pressed, but the case rather treated now as a question of costs. This may be better understood when it is seen that the bill alleges as a primary reason for equity procedure that the defendants "are without means to enable them to respond adequately in damages." The bill also gives the 28th of February, 1893, as the date when resort was had by the defendant to acts of intimidation, etc.

As to the disposition of the costs. This case might well have stopped after the hearing on March 11, 1893, and it is difficult to understand why it was not. After that date there was no real difficulty—the strikers all faithfully sought to conform their conduct to the law—and the testimony shows no infraction against the plaintiff's rights or in connection with the plaintiff's operations after that date. The damage claim does not appear to have been regarded with any great hope from the first, as indicated by the passage cited from the bill. The defendants suffered more, certainly very far more in proportion, than did the plaintiff, and their contest with the plaintiff was at best a very unequal one for them. And they conducted it with more regard for the law and in a better spirit of subordination to the law than any strike of similar proportion known to the region. When these matters are considered, the persistence with which this case has been pushed is all the more inexplicable. Of all the number of such cases begun in the county this is the only one pursued after the strike ceased. All this, it is true, does not detract from the plaintiff's right, but is proper for consideration in arriving at an equitable disposition of the costs. Then a great portion of the testimony and the costs were necessitated by the number of the defendants, only nine of whom are shown to have broken the law, the remaining twelve not so appearing. In view of all the circumstances of the case, a disposition of the costs in the same proportion, three sevenths to be paid by the nine defendants herein named and four sevenths by the plaintiff, seems a very equitable and just solution of the matter, and that order will be made.

It is presumed that nothing is desired or could be gained by a decree making the injunction perpetual as to said nine defendants, none of the exceptions intimating such purpose. So far as herein set forth the plaintiff's exceptions to the master's

report are sustained, and counsel can prepare a decree accordingly.

DECREE.

And now, December 12, A. D. 1896, the bill and answer in this suit having been referred to W. J. Johnson, Esq., master, and he having made a report favorable to the defendants, which report hath fully set forth the facts and evidence in the case; and exceptions to said report having been filed by complainant; and the said report and exceptions thereto having been fully considered by the court, the said exceptions as to nine of said defendants, namely Noah Behanna, George Hupp, Michael O'Neil, Robert I. Johnson, William Johnson, William T. Spalter, Jacob Carr, James McPherson and Thomas Haywood are sustained, except as to the amount of damages claimed, and it being presumed that nothing is desired or could be gained by making the injunction perpetual as to said nine defendants, none of the exceptions intimating such purpose, the court, therefore, do order and decree that the said nine defendants pay the three sevenths of the costs of this proceeding and the said plaintiff four sevenths of said costs.

*Error assigned* among others was the decree of the court.

*Edward Campbell*, with him *R. P. Kennedy*, for appellant.— The very corner stone of equitable procedure is that when a chancellor's jurisdiction has once rightfully attached, it shall be made effectual for the purposes of adequate and complete relief: 1 Story's Eq. Jur., sec. 64 k.

The question as to the maintenance of the bill and the granting of relief to complainant is to be determined by the status existing at the time of filing the bill.

Costs usually follow suit, and should do so in this case: 4 Brewster's Practice, sec. 6111; Shedrick v. Church, 160 Pa. 57; United States v. Workingmen's Amalgamated Council of New Orleans, 54 Fed. Repr. 995.

*A. D. Boyd*, of *Boyd & Umbel*, with him *Howell & Reppert*, for appellees.—Under the laws of the commonwealth of Pennsylvania the appellees not only had the right to quit work either individually or collectively, without in any way making them-

selves liable in damages to the appellant, but they had the right
by all lawful means, such as reasoning and persuasion, to pre-
vent other workmen from working for less wages than appel-
lees were willing to accept: Cote v. Murphy, 159 Pa. 425.

OPINION BY MR. JUSTICE MITCHELL, July 15, 1897:

We are obliged to differ wholly from the view of the facts
reported by the learned master. It is totally irreconcilable with
the testimony read in the light of experience and a knowledge
of human nature. Nor can we agree entirely with the view of
the court below, though it is more in accordance with the evi-
dence and the law. The learned judge in his opinion says,
" the testimony establishes the fact that certain of the defend-
ants overstepped these bounds and used annoyance, intimidation,
ridicule, and coercion, to prevent new men from engaging in
work for the plaintiff. When the new men were followed and
importuned not to work, from their point of embarkation to
their destination, and there met by the strikers in considerable
numbers, and followed to their lodging places, all the time
being pressed and entreated to return, and called 'scabs' and
'blacklegs,' and sometimes surrounded, and the effort made to
pull them away, an unfriendly (at least) atmosphere about
everywhere, it must be admitted that there was something more
than mere argument and persuasion, and the orderly and legiti-
mate conduct of a strike. This was certainly serious annoy-
ance and well calculated to intimidate and coerce. And that
effect was apparently produced on more than one occasion.
Nor did such acts entirely end when the men imported actually
began work, but such men were, on occasions and in a less pub-
lic manner, approached in a like manner in their intervals of
labor, and advised that there would be trouble there, and they
had better leave. No actual violence however was employed."

This is a mild and judicially restrained statement of what the
evidence clearly showed. The strikers and their counsel seem
to think that the former could do anything to attain their ends,
short of actual physical violence. This is a most serious mis-
conception. The "arguments," and "persuasion" and "ap-
peals" of a hostile and demonstrative mob have a potency over
men of ordinary nerve which far exceeds the limits of lawful-

ness. The display of force though none is actually used is intimidation, and as much unlawful as violence itself.

An attempt is made to argue that the strikers only congregated at the place of arrival of the new men in accordance with the custom at boat and train arrivals in small towns. But this disguise is too flimsy to hide the real purpose. If they desired in good faith to meet peaceably and lawfully for their own business, they should have selected another place sufficiently remote to be free from the excitement and crowds which their own testimony admits attended the arrival of the new men, and also far enough away to avoid the intimidating effect of a hostile crowd on the newcomers. But in truth they did not desire to avoid that effect. On the contrary that was what they were there for, and their presence indicates their real intentions too plainly for any verbal denials on their part to offset.

It is further urged that the strikers through their committees only exercised ("insisted on" is the phrase their counsel use in this court), their right to talk to the new men, to persuade them not to go to work. There was no such right. These men were there presumably under contract with the plaintiff, and certainly in search of work if not yet actually under pay. They were not at leisure, and their time, whether their own or their employer's, could not lawfully be taken up and their progress interfered with by these or any other outsiders on any pretense or under any claim of right, to argue or persuade them to break their contracts. Even therefore if the arguments and persuasion had been confined to lawful means, they were exerted at an improper time, and were an interference with the plaintiff's rights which made the perpetrators liable for any damages the plaintiff suffered in consequence. But in fact their efforts were not confined to lawful means. The result of the evidence, as stated by the learned judge, is that the new men were "followed and importuned not to work, from their point of embarkation to their destination, and there met by the strikers in considerable numbers, . . . . called 'scabs' and 'blacklegs,' and sometimes surrounded and the effort made to pull them away." This view is quite sufficiently favorable to the defendants, and, as already said, a hostile and threatening crowd does not need to resort to actual violence to be guilty of unlawful intimidation. The acts of these defendants were an unlawful interference

with the rights of the new men, and with those of the plaintiff. In Cote v. Murphy, 159 Pa. 420, it is said by our Brother DEAN, that "it is one of the indefeasible rights of a mechanic or laborer in this commonwealth to fix such value on his services as he sees proper, and under the constitution there is no power lodged anywhere to compel him to work for less than he chooses to accept," nor, as the same right may be stated with reference to this case, to prevent his working for such pay as he can get and is willing to accept. We regard the testimony as demonstrating that the defendants were guilty of an unlawful combination which, while professing the intention and trying to maintain an outward appearance of lawfulness, was carried out by violent and threatening conduct, which was equally a violation of the rights of the new men who came to work for plaintiff and of the plaintiff herself, and that they are liable in this suit for all the damages which plaintiff suffered thereby.

We have nothing at present to do with the acts of assembly from 1869 to 1891 which have modified the common law as to conspiracy. The question of their constitutionality was left open in Cote v. Murphy, supra, and does not need to be considered here, as the evidence takes the case entirely out of their provisions.

The learned judge below found no damages against any of the defendants, but made a distinction between them as to liability for costs. We do not think the evidence sustains this distinction. The master reports that "all of the defendants are included in the term strikers, as used by him in his report," and the testimony is ample to show that all participated personally in the unlawful conduct, or in such combination as made them liable for the acts of the others done in pursuance of the common purpose.

The view taken by the master prevented him from considering the subject of damages, nor did the learned judge make any specific findings on them. In the absence of such findings we do not enter on the discussion of the subject further than to say that the plaintiff has established her claim to some substantial damages, though her claim may be larger and may start at an earlier date than the proof will sustain. So far as yet appears the defendants did nothing to make them liable prior to the attempt of plaintiff to resume operations in February, 1893.

But after that date the violation of her rights is clear. The case must go back for examination and ascertainment of the facts on this branch of it.

Not the least notable feature is the expression of surprise by the counsel and even by the court that the case was pushed after the strike was over. It appears to be a fact that the strike was less violent and disorderly than others which had preceded it, and a sentiment seems to have pervaded the community, even the court not being entirely exempt, that the strike being over, the subject had better be dropped. This is not law nor justice. A plaintiff who might have been hurt worse than he was may be inclined not to push his claim for compensation for the injury actually received, but it is for him, and not for others, and especially not for courts, to make the choice, and there should be no judicial surprise if he insists on his rights, though other men may think discretion the better part of valor.

Decree reversed, bill reinstated and damages directed to be ascertained in accordance with this opinion. Costs to be paid by the appellees.