WILLIAM HILLENBRAND v. BUILDING TRADES COUNCIL
ET AL.

1. It is a violation of the legal right of the employer for third persons, either individually or collectively, to maliciously and without legal justification induce or coerce his workmen to leave his employment, or to solicit them to join a labor union, with intent to injure the employer in his business, or compel him to accede to the demands of the union.

2. Where the employer is unlawfully induced or coerced to discharge his workmen by reason of the malicious interference of individuals or combinations of individuals, the workmen may invoke the same law and are entitled to the same remedies as the employer against such interference.

3. Equity has jurisdiction, notwithstanding there may exist a legal remedy, to interfere by injunction to prevent a continuing injury, when the legal remedy therefor may involve a multiplicity of suits or the injury threatens an irreparable damage.

4. Equity looks through the form to the substance, and, in giving effect to the rule that wherever there is a wrong, there is a remedy, it will always consider the injury to be remedied rather than indulge in overnice discrimination as to the means or instrumentalities employed in producing the injury; and where the intent to injure is shown, together with acts pursuant thereto which tend to, and do in fact, produce injury, the nature of the acts is immaterial.

5. The display of force, though none is actually used, such as where

groups of members of a labor union visit non-union workmen at their homes or places of work in pursuance of an unlawful purpose against the employer, is "intimidation," and unlawful.

6. Those who knowingly and intentionally aid and abet a conspiracy, or other *quasi* criminal proceeding, are liable as principals.

7. An unincorporated labor union, which is joined as a codefendant with its individual members upon whom service may be had in their representative capacity, may be enjoined, as such, from unlawfully interfering with non-union workmen and their employer; and the injunction, when served upon the representative members of the union, will be binding upon the union, as an entity, and all its individual members, whether the latter be directly represented or not.

HOSEA, J.

The testimony in this case clearly shows the following facts:

Plaintiff is proprietor of a plumbing business in Cincinnati, in which he employs labor; and, predicated upon the use of his capital in the purchase of material and upon his right to employ labor, takes contracts for the plumbing work and equipment of buildings, public and private, in which the work of skilled plumbers is a vital element. He alleges, in this suit, unlawful and injurious interference in his business by defendants and asks protection against further wrongs of like nature by injunction of this court restraining the defendants collectively and individually.

Collectively, the defendants constitute two labor organizations known as unions, to-wit: The organization of plumbers known as "Local No. 59," being a local branch of the "United Association of Journeymen Plumbers, Gas Fitters, Steam Fitters and Steam Fitters' Helpers, of the United States and Canada," and the "Building Trades Council of Cincinnati and Vicinity." Both these are voluntary —that is, unincorporated—associations, having written constitutions and by-laws which are in evidence by printed copies.

On or about November 10, 1903, a "strike" was declared against plaintiff by the plumbers' local No. 59, and a number of his workmen called out by its order and prevented

from continuing in his employment.   It is shown that he was at this time engaged in the performance of various public and private contracts, or so-called "jobs," in various parts of the city and in various stages of completion, on which his employes were then at work.   There was no question of dispute or dissatisfaction, whatever, between himself and any of these workmen concerning wages, hours of service, conditions of employment or any other matters affecting the relations of employer and employed.   It is shown that immediately upon calling out the men who were members of the union, they and others were appointed on so-called "strike committees" by the union, and a systematic campaign was inaugurated against plaintiff, with the object, as admitted in evidence, of inducing his remaining employes and all those employed by him in place of strikers, to quit his service and refuse to be employed by him, in order to prevent him from securing new men ; and to induce such of these as were non-union men to join the plumbers' union—all as a means to the end of compelling him to accede to the demand of the plumbers' union.   This demand, briefly stated, was that he should pay a fine assessed against a member of their union in his employment, or compel the member to pay it, or discharge said employe —who was his own son—the alternative being the strike and its consequences.

Plainitff meantime made various efforts to continue his business and perform his outstanding contracts by employing other men, using boys and apprentices, and by endeavors to win back some of the striking employes who had been with him for many years, all at increased prices, and with indifferent success.   The "jobs" where his men were at work were visited by groups of strikers and committees, members of the plumbers' union, accompanied, in some instances, by the walking delegates of the Building Trades Council, and the work interfered with and his men enticed away.

In one such instance an employe who returned to work was treacherously and brutally attacked and severely injured while at work, by two men who called him a "scab"

and assaulted him in the presence of a member of the plumbers' union who was subsequently tried, convicted and fined, in the police court of Cincinnati, for participation in the assault ,and whose fine was paid by the financial secretary of the plumbers' union in the presence of the business agent of the Building Trades Council. The payment of this fine by the financial secretary of the plumbers' union No. 59 is admitted; and its officers also admit, on the stand, that no action by way of disclaimer or otherwise was taken by said union to deny its responsibility for the assault or to repudiate methods of this character in the conduct of the strike. It is also in evidence that daily meetings of the strike committees, business agents, and other officers, were held, at which detailed reports of all matters were required to be made, and it is admitted that the facts of the assault were known to all.

In another instance, shortly before the above assault, this same employe was visited by a group of members of the plumbers' union, at his house, after dark and, as he testifies, assaulted near by. The visiting parties, although members of the union, claim to have acted in this instance as volunteers, and while denying direct assault, admit that the "argument" was "very heated."

Other details in testimony of the defendants themselves, of the visits to workmen engaged on jobs,—such as demanding and tearing up the union cards of apprentices, making insulting suggestions, making direct and indirect references to the power of the union to exclude from membership those who might wish to join, or to impose heavy penalties by way of initiation fees, or to impose fines upon members,—all show that the general character of the argument used by way of so called "persuasion" was of a coercive and intimidating character throughout, and bear so cogent a relation to the actual assaults as to show the unlawful character and purposes of the campaign waged against the plaintiff through his employes.

Plaintiff testifies to the condition thus created as being disastrous to his business, rendering it impossible for him to take new contracts, and difficult to perform his existing

obligations, and to the general annoyance and pecuniary loss resulting therefrom.

In ascertaining the law applicable to the case I propose to consider the facts from the standpoint of fundamental rights and remedies, first, with reference to the defendants as individuals, and, second, as to the collective bodies as such.

The first of these lines of inquiry, starting with the conceded proposition that workmen have the right to quit their employment, brings us to the consideration of their legal rights after they have quit; and the second involves the question, whether, having assumed to act collectively under a definite form of organization, they may be dealt with and restrained in their organized capacity from collective acts producing collective wrong and injury.

We may take, as a starting-point, the corner-stone of the common law; namely, that wherever there is a wrong there the law furnishes a remedy. As quaintly expressed in Comyn's Digest, Title "Action on the Case," A:

"In all cases where a man hath a temporal loss or damage by the wrong of another he may have an action on the case to be repaired in damages. The intentional causing such a loss to another without justifiable cause and with the malicious purpose to inflict it, is of itself a wrong."

This principle has been applied and enforced from the earliest history of English jurisprudence, and has been applied from a very early period, to cases where, by inducement and persuasion, workmen were enticed away from the service of an employer. And, singularly enough, at the very outset we find the argument made at the bar in this case, namely: that the injury caused by enticing away workmen is *damnum absque injuria,* because the contract of the workman is indeterminate and terminable at will, is answered in one of the earliest cases by one of the ablest and most distinguished judges that ever graced the English bench.

In *Hart* v. *Aldrich,* Cowp. 54 (1774), journeymen shoemakers, working by the piece and for no determinate time,

were enticed away, to the damage of the employer in his business. Lord Holt sustained the case upon the ground that such a servant is, in law, a servant by the day, whether the work is by the piece or by the day.

In *Gunter* v. *Astor,* 4 Moore J. B., 12 (1819), the defendants clandestinely sent for the workmen of plaintiff, got them intoxicated and induced them to sign an agreement to leave the plaintiff and to come to them. It was held that as the act was of several and the end unlawful it amounted to a conspiracy.

In *Lumley* v. *Gye,* 2 Ell. & Bl., 216 (1853), the case was made out under a statute known as the statute of laborers, but the court declared that an action lay independently of the statute for maliciously inducing another to break a contract of any description where damage ensues to the party with whom the contract was made; and, where two or more parties were concerned in inflicting such injury, an indictment or writ of conspiracy at common law might be maintainable.

In *Walker* v. *Cronin,* 107 Mass., 555 (1871), the Supreme Court of Massachusetts enforced the same doctrines against a defendant who enticed away workmen in a shoe factory whereby the plaintiff lost their services and incurred expense in procuring others whom it was obliged to employ at higher wages. The court, speaking by Justice Wells, says:

"Every one has a right to enjoy the fruits and advantages of his own enterprise, industry, skill, and credit. He has no right to be protected against competition; but he has a right to be free from malicious and wanton interference, disturbance or annoyance. If disturbance or loss comes as a result of competition, or the exercise of like rights by others, it is *damnum absque injuria,* unless some superior right of contract or otherwise is interfered with. But if it comes from the merely wanton or malicious acts of others, without the justification of competition or the service of any interest or lawful purpose, it then stands on a different

footing, and falls within the principle of the authorities first referred to."

See also *Snow* v. *Wheeler*, 113 Mass., 179; *Dudley* v. *Briggs*, 141 Mass., 582 (6 N. E. Rep., 717; 5515 Am. St. Rep., 494); *Moran* v. *Dunphy*, 177 Mass., 485 (59 N. E. Rep., 125; 83 Am. St. Rep., 289).

In *Haskins* v. *Royster*, 70 N. C., 601 (16 Am. Rep., 780— 1874), the Supreme Court of North Carolina adopted and enforced these principles and sustained a case of damages for enticing away laborers during the harvesting season, and in the course of the opinion say:

"Any third person who maliciously, that is, without a lawful justification, induces the party who contracted to render the service to refuse to do so, is liable to the injured party in an action for damages."

In *Bowen* v. *Hall*, 6 Q. B., 333 (1881), nearly thirty years after the decision in *Lumley* v. *Gye, supra,* the Queen's Bench again carefully considered and affirmed the doctrine thus established, and said, by Brett, L. J.:

"Whenever a man does an act which in law and in fact is a wrongful act, such as may, as a natural and probable consequence of it, produce injury to another—and, in the particular case, does produce such an injury—an action on the case will lie. And the action does not the less lie because the consequence of the act complained of is the act of a third person. If the persuasion is used for the indirect purpose of injuring the plaintiff or of benefiting the defendant at the expense of the plaintiff, it is a malicious act, which in law and in fact is a wrongful act."

In *Angle* v. *Railway*, 151 U. S., 1, 13 (14 Sup. Ct. Rep., 240; 38 L. Ed., 55), the Supreme Court of the United States reviewed the authorities upon this doctrine, citing them with approval and deducing therefrom the application of the rule to "every case where one person maliciously persuades another to break any contract with a third per-

son," and holds that it is not confined to contracts of service.

I have preferred thus to trace the law anew to its sources, to show that the principles to be applied to so-called "labor" cases are neither new nor strained doctrines, but are as ancient as the law itself, resting "not"—as Lord Holt aptly says in the still earlier case of *Ashby* v. *White*—"upon particular instances and precedents, but upon the reason of the law, *'ubi eadem ratio ibi idem jus.'*"

The modern rule is simply this ancient rule stated in modern terms of thought and application. A comparatively recent expression of the Supreme Court of Illinois will illustrate this. I quote from *Doremus* v. *Hennessy,* 176 Ill., 608, 614 (52 N. E. Rep., 924; 54 N. E. Rep., 524; 43 L. R. A., 797; 68 Am. St. Rep., 203), as follows:

"The common law seeks to protect every person against the wrongful acts of others, whether committed alone or by combination, and an action may be had for injuries done, which cause another loss in the enjoyment of any right or privilege or property. No persons, individually or by combination, have the right to directly or indirectly interfere or disturb another in his lawful business or occupation, or to threaten to do so, for the sake of compelling him to do some act which, in his judgment, his own interest does not require."

Chief Justice Chatman, of the supreme judicial court of Massachusetts, in the case of *Carew* v. *Rutherford,* 106 Mass., 1 (8 Am. Rep. 287, 291), thus expresses it:

"Freedom is the policy of this country. But freedom does not imply a right in one person, either alone or in combination with others, to disturb or annoy another, either directly or indirectly, in his lawful business or occupation, or to threaten him with annoyance or injury, for the sake of compelling him to buy his peace."

In *Knudsen* v. *Benn,* 123 Fed. Rep. 636, 638, a distinguished judge of the federal court, says:

"Fellow workmen may agree together to leave at once the service of their employer; but having done so, and being no longer interested in the matter, then, notwithstanding certain *dicta* in cases that have been read from, it does not seem clear that they are acting lawfully when they are persuading the servants of their former employer to break their contracts and leave the service. It is a matter that does not concern them any longer. It is a matter that is apparently injurious to their former employer. It seems to me that such an interference in a matter with which they have no rightful concern and which is injurious to another is not lawful. \* \* \* they have no right to interfere with that business in any way."

These cases I have selected from many, as illustrative, merely, to show clearly the nature of the rule of law in general terms, applicable primarily to individuals, but also to combinations as such, where acts are done in a collective capacity.

It will be observed that the question is, broadly, of wrong and remedy. The wrong is the injury causing loss or damage; and the jurisdiction of equity to prevent such wrong by its restraining power has been long settled.

In *Barr* v. *Trades Council,* 53 N. J. Eq. (30 Atl. Rep., 881, 890), it is said:

"Even when there is a legal remedy, equity will interfere by injunction to prevent (1) an injury which threatens an irreparable damage, or (2) a continuing injury, when the legal remedy therefor may involve a multiplicity of suits. This jurisdiction is established and unquestionable."

A very pertinent and forceful expression as to the nature of the injury inflicted upon an employer by seducing away workmen, is given in the case of *Frank* v. *Herold,* 52 Atl. Rep., 152 (63 N. J. Eq., 443), as follows:

"In doing so they are inflicting an injury upon the complainants, in respect to their private rights, precisely the same as they would if they broke, interfered with or clogged the engine that drove their machinery, and for such injury

the complainants are entitled to a legal remedy by action.
Now, this being so, the next question is, what right have the
complainants here in this court asking for the restraining
power of the court? The answer to this is twofold: First,
it is quite plain that the relief in damages to be recovered
in an action at law is entirely inadequate. It is quite ab-
surd to say that they can sue each of these persons, and
recover damages against them in separate suits, for every
little act, which, in the aggregate, tends to result in injury.
And, in the second place, the injury is continuing and ir-
reparable, and not capable of admeasurement, according
to legal principles. So that, at law, the remedy is entirely
inadequate. It is, therefore, a clear case for the interpo-
sition of a court of equity to exercise its preventive remedy,
and that is the particular sphere at this day of a court of
equity, as contradistinguished from a court of law."

In giving effect to the principle of law invoked—namely,
that for the wrong inflicted the plaintiff has a right to a
remedy—a court of equity, which looks through the
form to the substance, will consider the injury to be
remedied rather than indulge in overnice discrimination
as to the means or instrumentalities employed in producing
the injury. Where the intent to injure is shown, together
with acts pursuant thereto which tend to and do in fact
produce the injury, the nature of the acts is immaterial,
It is quite true that certain acts, considered by themselves,
might, under proper circumstances, be regarded as the ex-
ercise of the ordinary rights of a citizen; but, when taken
in connection with the object, and the time, place and cir-
cumstances of the occurrence, are component parts of a
plan or scheme whose unlawfulness permeates every single
step of its progress. As was said in *Barr* v. *Trades Coun-
cil*, 53 N. J. Eq., 101 (30 Atl. Rep., 881, 886):

"Nor does it matter whether the wrongdoer effects his
object by persuasion or by false representation. The court
looks through the instrumentality or means used to the
wrong perpetrated with the malicious intent, and bases
the right of action upon that." Approved in *Van Horn* v.

*Van Horn,* 56 N. J. Law, 318 (28 Atl. Rep., 669; 10 L. R. A., 184).

This was particularized with reference to cases like the present, in *Jersey City Ptg. Co.* v. *Cassidy,* 53 Atl. Rep., 230, 232 (63 N. J. Eq., 759), as follows:

"That the interest of an employer or an employe in a contract for services is property, is conceded. Where defendants in combination or individually undertake to interfere with and disrupt existing contract relations between the employer and employe, it is plain that a property right is directly invaded. The effect is the same whether the means employed to cause the workman to break his contract and thus injure the employer are violence or threats of violence against the employe, or mere molestation, annoyance, or persuasions. In all these cases whatever the means may be, they constituted the cause of the breaking of a contract, and consequently they constitute the natural and proximate cause of damage."

The rule is again well stated in *Lucke* v. *Cutters & Trimmers' Assembly,* 77 Md., 396 (26 Atl. Rep., 505; 19 L. R. A., 408; 39 Am. St. Rep., 421), and the distinction drawn between persuasion, which may be a lawful act and persuasion used as the instrument of accomplishing an unlawful purpose. Paraphrasing the language of *Bowen* v. *Hall, supra,* the court says:

" 'Merely to persuade a person to break his contract may or may not be wrongful in law or fact, * * * but if the persuasion be used for the indirect purpose of injuring the plaintiff, or of benefiting the defendant at the expense of the plaintiff, it is a malicious act, which is in law and fact a wrongful act, and therefore an actionable act, if injury follows from it."

These principles are set forth in *London Guarantee & Acc. Co.* v. *Horn,* 101 Ill. App., 355; *Moran* v. *Dunphy,* 177 Mass., 485, 492 (59 N. E. Rep., 125; 83 Am. St. Rep., 289); *Richards, Ex parte,* 117 Fed. Rep., 658; *Southern Ry.* v. *Local Union,* 111 Fed. Rep., 49; *Debs, In re,* 158

U. S., 564 (15 Sup. Ct. Rep., 900; 39 L. Ed., 1092);
Flaccus v. Smith, 199 Pa. St., 128 (48 Atl. Rep., 894; 54
L. R. A., 640; 85 Am. St. Rep., 779), and in other cases
to which I will make more specific reference later.

It may be noted, in passing, that the rule as to unlawfully
interfering between any employer and his workmen is not
a one-sided rule, but works both ways, thus illustrating the
remark of Lord Holt, cited, that where the reason is the
same, the law is the same. So that, in cases where by ma-
licious interference of others the employer is induced to dis-
charge his workmen, the workmen may invoke the same
law and have the same remedy.

The general principle, thus seen to be well established in
the law from the earliest times, is the same that I had oc-
casion to state in general terms in the case of Cincinnati
Beveling & Sil. Co. v. Precht, in this court in May last as
follows:

"The Bill of Rights embodied in the Constitution of Ohio
guarantees to every citizen, an inalenable right—among
others—of acquiring, possessing, and protecting property
and of seeking and obtaining happiness and safety; and it
is therein further provided that courts shall be open to
every one for the exercise of his remedy by due course of
law for an injury done him in his land, goods or person.
No one need be told that the right to carry on legitimate
business freely, without molestation or hindrance, is not
only the right and privilege of the citizen under these fun-
damental guarantees of the Constitution, but is essential to
the well-being of every civilized community; and that it is
the duty of the courts to afford every reasonable protection
to the exercise of such right. The right of the laboring man,
whose business capital is his skill and industry, is to be
upheld and protected equally with the right of an employer
of labor to carry on a manufacture involving such employ-
ment; and the fact that these rights are reciprocal, in no-
wise lessens the obligation of the courts to see that both
are properly protected."

This court has on various other occasions been called

upon to apply these obviously just principles in cases of this general nature, some of which counsel have referred to in argument.

It remains, in concluding this branch of the case, to refer to a few modern decisions of high authority bearing more directly upon certain phases of the acts of the defendants.

The practice of soliciting workmen to join a labor union, when done, as in the present case, with intent to injure an employer in his business or compel him to accede to the demands of the union, is unlawful and may be restrained.

In *Flaccus* v. *Smith,* 199 Pa. St., 128 (48 Atl. Rep., 894, 895 ; 54 L. R. A., 640 ; 85 Am. St. Rep., 779), this was prohibited in the injunction order, the court saying :

"The appellee had an unquestioned right, in the conduct of his business, to employ workmen who were independent of any labor union, and he had the further right to adopt a system of apprenticeship which excluded his apprentices from membership in such a union. He was responsible to no one for his ·reasons in adopting such a system, and no one had a right to interfere with it to his prejudice or injury."

To the same effect, see *Lucke* v. *Cutters' & Trimmers' Assembly, supra; O'Neil* v. *Behanna,* 182 Pa. St., 236 (37 Atl. Rep., 843 ; 61 Am. St. Rep., 102) ; *Curran* v.` *Galen,* 152 N. Y., 33 (46 N. E. Rep., 297 ; 37 L. R. A., 802 ; 57 Am. St. Rep., 496) ; *Moran* v. *Dunphy, supra; Barr* v. *Trades Council, supra.*

This principle has quite recently been applied in the case of *United States Ptg. Co.* v. *Stereotypers' Union* by the Supreme Court of Brooklyn, to which I shall have occasion to advert later on.

Visiting "jobs" where workmen are employed, to persuade workmen to quit service or to join the union, has been repeatedly condemned as unlawful. The language of the court in *O'Neil* v. *Behanna, supra,* page 844, is as follows :

"It is further urged that the strikers, through their com-

mittees, only exercised ('insisted on' is the phrase their counsel used in this court) their right to talk to the new men to persuade them not to go to work. There was no such right. These men were there presumably under contract with the plaintiff, and certainly in search of work, if not actually under pay. They were not at leisure, and their time, whether their own or their employer's, could not lawfully be taken up, and their progress interfered with, by these or any other outsiders, on any pretense or under any claim of right to argue or persuade them to break their contracts. Even, therefore, if the arguments and persuasion had been confined to lawful means, they were exerted at an improper time, and were an interference with the plaintiff's rights, which made the perpetrators liable for any damages the plaintiff suffered in consequence."

See, in support, *Flaccus* v. *Smith, supra; Richards, Ex parte,* 117 Fed. Rep., 658; *Southern Ry.* v. *Local Union,* 111 Fed. Rep., 49.

Visiting employes at their homes, or at their places of work in groups in pursuance of the unlawful purpose against the employer, is of itself intimidation.

In *O'Neil* v. *Behanna, supra,* page 843, the court says:

"The 'arguments,' 'persuasion' and 'appeals' of a hostile and demonstrative mob have a potency over men of ordinary nerve which far exceeds the limits of lawlessness. The display of force, though none is actually used, is intimidation, and is as much unlawful as violence itself."

The application of this rule to the circumstances of the visit of various members of the plumbers' union to Black, will be sufficiently obvious, as indeed to all the visits of committees and individuals in groups of four to six or more, to the plaintiff's employes.

The remarks of Justice Brewer of the United States Supreme Court in his address before the New York Bar Association in 1893 are also instructive on this point. He says:

"When laborers gather round and say to those who seek employment that they had better not, and when that advice

is supplemented by assault on one who disregards it, every one knows that something more than advice is intended. It is coercion—force; it is the effort of the many by the mere weight of numbers to compel the one to do their bidding; it is a proceeding outside of the law, in defiance of the law; and in spirit and effect an attempt to strip from one that which of right belongs to him—the full and undisturbed use of his own."

Such also is the language of Judge Smith of this court in *Eureka Foundry Co. v. Lehker,* 13 Dec., 398, 402:

"Any course of conduct upon the part of others which deprives or substantially affects the freedom of mind of such workmen in reaching a decision to remain with him, or the freedom of will in carrying that decision into execution, is an unlawful interference with the right of the owner of the business."

This is practically the view of the supreme court of Massachusetts as expressed in *Plant* v. *Woods,* 176 Mass., 492, 493 (57 N. E. Rep., 1011, 1015; 51 L. R. A., 339; 79 Am. St. Rep., 330):

"It is true they committed no acts of personal violence, or physical injury to property, although they threatened to do something which might reasonably be expected to lead to such results. In their threat, however, there was plainly that which was coercive in its effect upon the will. It is not necessary that the liberty of the body should be restrained. Restraint of the mind, provided it be such as would be likely to force a man against his will to grant the thing demanded, and actually has that effect, is sufficient in cases like this."

I will refer here to but one more case, for its aptness as a close illustration of the methods and acts shown in the case at bar, namely, *Carew* v. *Rutherford,* 106 Mass., 1 (8 Am. Rep., 287, 294), in which it was said:

"We have no doubt that a conspiracy against a mechanic, who is under the necessity of employing workmen in order

to carry on his business, to obtain a sum of money from him, which he is under no legal liability to pay, by inducing his workmen to leave him, and by deterring others from entering into his employment, or by threatening to do this, so that he is induced to pay the money demanded, under a reasonable apprehension that he can not carry on his business without yielding to the illegal demand, is an illegal, if not a criminal, conspiracy; that the acts done under it are illegal; and that the money thus obtained may be recovered back, and, if the parties succeed in injuring his business, they are liable to pay all the damage done to him. It is a species of annoyance and extortion which the common law has never tolerated.

"This principle does not interfere with the freedom of business, but protects it."

There can be no question under the evidence in this case that the acts complained of and shown to have been committed by the individual defendants were unlawful.

We proceed now to inquire as to the responsibility of the organized bodies which are also made defendants.

It is clear, from the testimony in this case, that the direct source and controlling influence of whatever wrong and injury has been suffered by the plaintiff, is the plumbers' union local No. 59, and the individual defendants were its instruments.

The Building Trades Council, occupying the relation of a co-operative organization composed of delegates of the plumbers' union and other unions, is liable as an accessory, under the evidence and admissions showing the official action giving its moral countenance and support and furnishing money to the plumbers' union under circumstances showing knowledge that the funds were to be used in aid of the strike, and evidence showing the direct participation in the details of carrying on the campaign of so-called "persuasion" by and through its walking delegate or business agent, all within the substantial purposes of its organization as shown by its constitution and by-laws. It is fundamental law in conspiracy and other *quasi* criminal proceed-

ings that those who aid and abet with knowledge and intention are equally liable with the principals.

Farther than this it does not seem to me necessary to refer to the constitutional or declared purposes of the defendant unions. It will be sufficient for the purposes of this case to note that they are highly specialized organizations of a permanent character, having the form and many of the characteristics of corporate bodies.

The courts heretofore generally in dealing with cases such as the one at bar have treated the unlawful acts as those of individuals engaged in a conspiracy with reference to the immediate purpose evidenced by the acts in question, as in the early cases of *Gunter* v. *Astor* and *Lumley* v. *Gye, supra,* and as will appear in a few more modern cases to which I will now refer.

Thus in *Plant* v. *Woods, supra,* there was shown a combination of unions to coerce the employer to discharge employes who refused to join the union, and the court said of it, page 1015:

"Such acts are without justification, and therefore are malicious and unlawful, and the conspiracy thus to force the plaintiffs was unlawful. Such conduct is intolerable, and inconsistent with the spirit of our laws. The language used by this court in *Carew* v. *Rutherford,* 106 Mass., 1, may be repeated here with emphasis, as applicable to this case: 'The facts alleged and proved in this case are peculiarly offensive to the free principles which prevail in this country, and, if such practices could enjoy impunity, they would tend to establish a tyranny of irresponsible persons over labor and mechanical business which would be extremely injurious to both.' "

In *Boutwell* v. *Marr,* 42 Atl. Rep., 607, 609 (71 Vt., 1; 43 L. R. A., 803; 76 Am. St. Rep., 746), there was shown a combination of employers for an unlawful purpose, and the Supreme Court of Vermont had this to say in the opinion:

"Without undertaking to designate with precision the lawful limit of organized effort, it may safely be affirmed that

when the will of the majority of an organized body, in matters involving the rights of outside parties, is enforced upon its members by means of fines and penalties, the situation is essentially the same as when unity of action is secured among unorganized iundividuals by threats or intimidation. The withdrawal of patronage by concerted action, if legal in itself, becomes illegal when the concert of action is procured by coercion."

The Supreme Court of Wisconsin has spoken in similar terms of such conmbinations, as will appear from the following taken from the opinion in *Gatzow* v. *Buening,* 81 N. W. Rep., 1003 (106 Wis., 1; 49 L. R. A., 475; 80 Am. St. Rep., 17) :

"If an unlawful combination exists, it is none the less unlawful because existing under a self-imposed constitution and governed by by-laws, and because it conducts its operations in a public or semi-public way, asserting the right, in pursuit of its purposes to interfere with individual liberty and with the public interests.   * * *

"The union under consideration is within the condemnation of the common-law rule that a combination of persons, natural or artificial, to restrict legitimate trade in any field, by hampering or destroying individual liberty, stifling competition or preventing the exercise of individual freedom to dispose of one's labor or capital according to his own free will, so long as the legal rights of other persons are not infringed upon, is unlawful."

Judge Smith, of this court, in the case of *Graf* v. *Master Horseshoers' Protective Assn.,* 15 Dec., 18, a case arising between an organized association of boss horseshoers and one of its members upon a rule or by-law of the association, has enforced the general principle, and used this language in his opinion, the defendants being incorporated:

"The principle is well settled that contracts, agreements, combinations or arrangements between persons in the same business, the tendency of which is to impair competition and enhance prices, to the injury of the public, are against

public policy and therefore illegal and void; and as the combined action of the members of this association is to prevent competition among such members and to increase the price of horseshoeing to the public, any resolution or by-law whose object is to effect such combined action is illegal and void." Citing *Emery* v. *Candle Co.,* 47 Ohio St., 320; *Central Ohio Salt Co.* v. *Guthrie,* 35 Ohio St., 666; *State* v. *Oil Co.,* 49 Ohio St., 137, * * *

"Nor would the language used be any the less a threat because when used alone it appeared harmless, but when used in connection with. the tone of voice in which. it was expressed, the gestures accompanying it or other surrounding circumstances, it conveyed to the mind a threat. A veiled threat is still a threat."

The court also refers to *Bailey* v. *Plumbers' Assn.,* 52 S. W. Rep., 853 (103 Tenn., 99; 46 L. R. A., 561); *Congress & Empire Spring Co.* v. *Knowlton,* 103 U. S., 49 (26 L. Ed., 347); *Hafer* v. *Railway,* 9 Re., 470 (14 Bull., 68); *McCutcheon* v. *Capsule Co.,* 71 Fed. Rep., 787.

These latter cases, referring to associations of employers, are noteworthy in this connection as illustrating the entire impartiality of the fundamental rule of law stated by Lord Holt, and referred to earlier in this opinion, that where a like reason exists, there the law applicable is the same. In other words, the law, upon principles the same, will be enforced against employers as well as those employed.

In *United States* v. *Weber,* 114 Fed. Rep., 950, 953, it is said:

"The right of the employes of the receivers to voluntarily join a union that has only legal purposes in view can not be denied. * * * But if the object of the union is illegal, or if the methods employed by it, either to induce acquisitions to its ranks or to accomplish its ulterior purposes, are illegal, it appears to be well settled that the persons who combine in such efforts are conspirators."

The case of *Quinn* v. *Leathem,* H. of L., 1901, 85 Law Times, 298, is also instructive as showing the views of the

eminent judges of the House of Lords as to the same general principle. This was a suit in damages against a union of journeymen butchers for enforcing a rule of the union prohibiting its members from working with non-union butchers, or from handling meat received from a place where non-union men were employed. Damages to the extent of $1,250 were enforced against the union through its treasurer, Quinn. On appeal the judgment was affirmed and Lord Lindley, in delivering his opinion, said:

"As to the plaintiff's rights. He had the ordinary rights of a British subject. He was at liberty to earn his own living in his own way, provided that he did not violate some special law prohibiting him from so doing, and provided he did not infringe the rights of other people. This liberty involved liberty to deal with other persons who were willing to deal with him. This liberty is a right recognized by law; its correlative is the general duty of every one not to prevent the free exercise of this liberty without justification. But a person's liberty or right to deal with others is nugatory unless they are at liberty to deal with him if they choose to do so. Any interference with their liberty to deal with him affects him."

As showing the general consensus of judicial opinion as deduced from a long list of cases in courts of last resort, the following summary from 18 Am. & Eng. Ency. Law (2d Ed.), 84, 85, is significant:

"The means by which a labor combination seeks to effect its purposes is that of inflicting injury upon its opponent or of inspiring him with fear of injury. Coupled with its demands it always expressly or impliedly holds out as an alternative the displeasure of the union, and the injurious consequences flowing therefrom. Whether a combination to effect an end by these means is criminal or not depends upon the lawfulness of the mode in which the injury is inflicted or threatened; that is, whether it is an actionable wrong, or is merely such as the law denominates *damnum absque injuria.* * * *

"But to be unlawful it is not necessary that the intimidation should be directed against the employer, or that there should be any overt act of violence, or any direct threat by word of mouth.  If the members of a labor union, by previous agreement or concerted action, congregate at or near the works of an employer with the intention of intimidating the employes of the establishment by displaying opposition to the course pursued by such employes in continuing to work, such combination is unlawful, and all persons engaged therein are guilty of conspiracy.  *  *  *

"But the means employed by a labor union, in order to be illegal, need not be carried to the length of violence or intimidation.  Acts creating a nuisance intended to annoy and disturb an employer, his workmen or customers, in the enjoyment of their several rights, are illegal, and those who by preconcert perform these acts are guilty of criminal conspiracy."

I will conclude the citations of authority on this point by the following extract from the award of the Anthracite Coal Commission, a body of distinguished men appointed by the President, representing in its membership the cause of labor as well as other interests concerned, whose deliberate and official utterance is, therefore, of especial value:

"It is the legal right of any man, or set of men, to voluntarily refrain from social intercourse or business relations with any person whom he or they, with or without good reason, dislike.  This may sometimes be unchristian, but it is not illegal.  But when it is a concerted purpose of a number of persons not only to abstain themselves from such intercourse, but to render the life of their victim miserable by persuading and intimidating others so to refrain, such purpose is a malicious one, and the concerted attempt to accomplish it is a conspiracy at common law, and merits and should receive the punishment due to such a crime."

I pass now to the final important matter presented in this case.

The labor unions made defendants in this case, having assumed permanence of form as organized bodies, acting with all the precision, certainty and force of incorporated bodies, and having instituted, directed and carried out the unlawful acts shown, through and by means of their machinery of organization, and through the individual defendants as its instruments, the question naturally arises: whether they should not be treated in their collective capacity as wrongdoers and held liable as such for the collective wrongs?

The ancient rule of the common law, cited in the beginning of this opinion, is unlimited in its terms, and, to be fully effective, should be unlimited in its application; and it is obvious that this can not be so if it can not furnish a collective remedy for a collective wrong.

The doctrines of conspiracy do not fully reach the point in question; and the rigidity of common law rules preclude that full and flexible adaptation of remedy that is desirable. For this reason we must look to equity for solution of the problem.

It is a cardinal principle of equity that it looks through the forms of things to the substance; and, acting upon this principle, courts of equity early recognized the necessity of a collective remedy. The problem of adapting legal proceedings to unincorporated societies consisting of many members is not new, but arose from the difficulty of applying the rigid rules of the common law to just such cases, and to avoid the necessity of a multiplicity of actions where the community of interest was not embodied in recognized legal entities, such as partnerships or corporations, but nevertheless existed.

This rule of equity procedure, long recognized in the chancery jurisdiction of England, has also long been embodied in the statute law of this state.

Section 5008, Revised Statutes, provides that:

"When the question is one of a common or general interest of many persons, or when the parties are very numerous,

and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all."

This section was considered and construed in the case of *Platt* v. *Colvin,* 50 Ohio St., 703, upon the objection that the plaintiff, who was president of an association of about 1,000 shareholders, was but one of many in interest. The court finds that the association was not a partnership under our statute, and could not act in its partnership name. It then refers to the rule of equity as stated in Story, Eq. Pl., Section 97, formulating the exceptions to the rule requiring prosecutions by all parties in interest, as follows:

(1) Where the question is one of a common or general interest and one or more sue or defend for the benefit of the whole.

(2) Where the parties form a voluntary association for public or private purposes, and those who sue or defend may fairly be presumed to represent the rights and interests of the whole.

(3) Where the parties are very numerous and although they may have separate and distinct interests, yet it is impracticable to bring them all before the court.

By way of illustrating the application of the principle, the court cites *Taylor* v. *Salmon,* 4 Myl. & Cr. (18 Eng. Ch. Rep.), 134, a suit by directors of an unincorporated mining company, wherein Lord Chancellor Cottenham held that where parties were numerous and the suit was for an object common to all, some of the body might maintain a bill on behalf of themselves and the others.

Also, *Walworth* v.. *Holt,* 4 Myl. & Cr., 619, where, in a similar suit by certain members of a shareholding company, for unpaid subscriptions, a demurrer for like cause was overruled. And in this case the lord chancellor makes the following noteworthy observation: That it was the duty of the court, "to adapt its practice and course of proceeding to the existing state of society, and not by too strict an adherence to forms and rules, established under different circumstances, to decline to administer justice, and to enforce rights for which there is no other remedy."

Also, *Small* v. *Atwood,* 1 Younge, 407, wherein Lord Chief Baron Lyndhurst enforced the same doctrine, holding the exception to have been established at a very early period for the purpose of preventing a failure of justice.

Also, *Chancey* v. *May,* Prec. Ch., 592, a suit brought by the treasurer and managers of an unincorporated company on behalf of themselves and all other proprietors, charging the late treasurer and managers with embezzlement of the partnership funds, and the same rule was enforced for like reasons.

"This rule, and its exceptions," says our Supreme Court, "in their breadth and substance were adopted in our code, Sections 4993, 5007, 5008, Revised Statutes; and, by its provisions made applicable to our civil action, which was substituted for what was theretofore known as a suit in equity, and the action at law. * * * Indeed, the mode of procedure in the civil action, is, in most respects, taken from and assimilated to that which prevailed in a suit in chancery."

And the court in applying these principles overrules objections and sustains the suit, saying further:

"We see no reason why judgment against the plaintiff will not be binding upon all whom he represents, or judgment in his favor inure to their benefit. Each stockholder, by becoming a member of the association, gave his consent to the rule of its being, that suits in its behalf might be presented according to the law applicable to it, and the judgment in any action so prosecuted with its consent must necessarily operate upon all as if they were named in the suit."

Labor unions have been recognized by law in Ohio as entities capable of exercising the rights of individuals, as in the trades union acts of Great Britain. Thus, by Sections 4364-49, Revised Statutes, they are authorized to adopt and possess a trade-mark label in the union name, which name may be registered as such with the secretary of state (Section 4364-51). They may sue to enjoin the unauthorized use of such labels (Section 4364-53) ; or to recover the

penalty (Section 4364-53a) ; and, where unincorporated, may, by special statute, sue by an officer or member for the benefit of all (Section 4364-53a, Revised Statutes), which recognizes the application of the equity rule.   Indeed, the Legislature has attempted to make it unlawful to prevent men from joining labor unions or to discharge from employment because of such membership.   Section 4364-68, Revised Statutes.

Those statutes are analogous in certain respects to the trades union acts of England, in so far as they recognize and establish the labor union as a distinct entity in its collective capacity, capable of holding property and exercising rights of ownership; and by consequence being subject to corresponding liabilities.

This view is sustained and established by a recent case of highest authority arising in the court of King's Bench in England, viz.:   *Taff Vale Ry.* v. *Amalgamated Soc. of Ry. Servants*, L. R. (1901), 426.   In this case Farrell, J., issued an injunction against the respondent society, also against Bell, its general secretary, and Holmes, its organizing secretary, which was reconsidered and affirmed upon motion to strike out the name of the respondent society.

The injunction order restrained the society, its servants, etc., from watching or besetting the railway station or works, or approaches thereto, or places of residence of any of its officers or workmen employed or proposing to work for them, for the purpose of persuading or otherwise preventing persons from working or for any purpose except to obtain or communicate information, and from procuring any person who had or might enter into any contracts with the plaintiff to commit a breach of such contracts.

The motion was, substantially as in the case at bar, upon the ground that the society was not a corporation nor an individiual, and could not be sued in a *quasi* corporate capacity.   The court in its opinion admits that it is not a corporation nor an individual nor a partnership; but defines the union under the trades union acts as "any combination for regulating the relations between workmen and masters, or for imposing restrictive conditions on the conduct of any

trade or business." The argument on the motion was that it was an illegal association, which the court intimates had no force in an action in tort, saying:

"The acts complained of are the acts of the association. They are the acts done by their agents in the course of the management and direction of a strike; the undertaking such management and direction is one of the main objects of the defendant society and it is perfectly lawful: but the society, in undertaking the management and direction, undertook also the responsiblity for the manner in which the strike is carried out. The fact that no action could be brought at law or in equity to compel the society to interfere or refrain from interfering in the strike is immaterial; it is not a question of the rights of members of the society, but of the wrong done to persons outside the society. For such wrongs, arising as they do from the wrongful conduct of the agents of the society in the course of managing the strike which is a lawful object of the society, the defendant society is, in my opinion, liable."

The appeal court reversed this ruling and the case then came on for review by the judiciary committee of the House of Lords, of which the most eminent jurists of England are members, and by unanimous judgment the appeal court was reversed and the ruling and opinion of Farwell, J., restored. I shall refer only to the expressed views of one or two of the judges.

Lord McNaughten held, among other things, that persons should be liable for concerted as well as individual action whatever be the form of association; that they might be sued in a representative action whether registered or unregistered. "The registered name," he said, "is nothing more than the collective name for all its members."

Lord Lindley, one of the ablest of all the bench, referring to the principle of equity procedure (which is embodied in Section 5008, Revised Statutes), said: "The principle is applicable to new cases as well as old and ought to be applied to the exigencies of modern life as occasion requires," and proceeds to show that if the trustees in whom

the property of the society is vested were added as parties, an order could be made for payment by them out of the funds of the society of all damages and costs for which the plaintiff might obtain judgment.

To the same substantial effect is *United States* v. *Coal Dealers' Assn.,* 85 Fed. Rep., 252.  Also *United States Ptg. Co.* v. *Stereotypers' Union,* Supreme Court of Brooklyn. This case, not yet reported, involved, as I am advised, the same question as to the right to enjoin unions as such.  Suit was brought to enjoin execution of contract between plaintiff and defendants whereby plaintiff was to discharge all its non-union workmen who should not have joined one or the other of the defendant unions before a certain date.

In granting the injunction, Justice Dickey says:

"If the purpose of the unions in their agreements was to hamper or restrict the freedom of plaintiff and other workmen in pursuing their lawful trade, and, through arrangements with their employers, coerce them to become members of union organizations, or lose their positions, or be deprived of employment, such purpose is against public policy and is unlawful.  The unions can not arrange a plan of compelling workmen not in affiliation with their organization to join them at the price of being deprived of their employment."

In view of these authorities, supplementing the rulings of our Supreme Court, I entertain no doubt that the injunction will lie against an unincorporated labor union by the name (which is but the "collective name of all its members") when sued together with one or more of its members individually upon whom service may be had in their representative capacity, and that such injunction will be binding upon the body as an entity and against all its members, whether or not they be directly represented.

It follows, from what has been said, that the prayer for a perpetual injunction must be granted; and inasmuch as the question of "persuasion" has been made an issue, and as the evidence  clearly shows that persuasion in this case

means and includes coercion and intimidation as defined by the authorities, the injunction order must be modified to include such persuasion, and may be, if necessary, redrafted to conform to this opinion in other respects.

Perpetual injunction ordered.

*Charles F. Williams,* for plaintiff.
*Dempsey & Fridman* and *Raymond Ratliff,* for defendants.